ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 2 9 2017

CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES OF AMERICA

v.                                          Case No: 4:17-CR-158-A

ANGEL RENEE NORRIS (05)

## GOVERNMENT'S SUBMISSION OF TRANSCRIPT OF DETENTION HEARING

The United States of America, by and through the United States Attorney for the

Northern District of Texas, would show the Court as follows:

On September 26, 2017, this court ordered the government to file a copy of the

transcript of the detention hearing conducted on July 27, 2017 before Magistrate Judge

Jeffrey L. Cureton.    The transcript is hereby attached.

Respectfully submitted,

JOHN R. PARKER
UNITED STATES ATTORNEY

SHAWN SMITH
Assistant United States Attorney
Texas State Bar No. 24033206
801 Cherry Street, Suite 1700
Fort Worth, Texas    76102
Telephone:    817-252-5200
Facsimile:    817-252-5455

**Submission of Transcript – Page 1**

## CERTIFICATE OF SERVICE

I hereby certify that on _September 29, 2017_ the foregoing Government's Submission of Transcript was served by first class mail to Danny Burns at 115 N. Henderson Street, Fort Worth, Texas 76102-1940, counsel for defendant.

SHAWN SMITH
Assistant United States Attorney

Attachment:
Transcript

1
                UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2
                    FORT WORTH DIVISION

3

4
UNITED STATES OF AMERICA,    )  **Case No.  4:17-MJ-00582-BJ**
                     )  (4:17-CR-164-O-1)
5
      Plaintiff,       )  (4:17-CR-197-O-3)
                     )  (4:17-CR-168-O-2)
6
v.                   )
                     )  Fort Worth, Texas
7
HEATHER RENEE DEAN (02);     )  July 27, 2017
JASON RAND EASLEY (04); and  )  10:00 a.m.
8
JOHN WESLEY PENNESTON (07),  )
                     )  PRELIMINARY HEARING
      Defendants.      )  DETENTION HEARING
9
                     )

                     )
10
UNITED STATES OF AMERICA,    )  **Case No. 4:17-MJ-589-BJ**
                     )  (4:17-CR-198-A-6)
11
      Plaintiff,       )  (4:17-CR-166-O-1)
                     )  (4:17-CR-158-A-5)
12
v.                   )
                     )
13
TROY DEWAYNE BELL (02);      )
KARRISSA MARIE GLENN (05);   )
14
and ANGEL RENEE NORRIS (07),  )  PRELIMINARY HEARING
                     )  DETENTION HEARING
15
      Defendants.      )
                     )
16
              TRANSCRIPT OF PROCEEDINGS
17
      BEFORE THE HONORABLE JEFFREY L. CURETON,
         UNITED STATES MAGISTRATE JUDGE.
18
APPEARANCES:
19
For the Government:          Shawn Smith
20
                       ASSISTANT UNITED STATES ATTORNEY
                       Burnett Plaza, Suite 1700
21
                       801 Cherry Street, Unit #4
                       Fort Worth, TX  76102-6882
22
                       (817) 252-5200
23
For Defendant Dean:          Leigh Warren Davis
                       1901 Central Drive, Suite 708
24
                       Bedford, TX  76021
                       (817) 868-9500
25

```
 1   APPEARANCES, cont'd.:

 2   For Defendant Easley:          Anthony H. Green
                                    LAW OFFICE OF ANTHONY GREEN
 3                                  P.O. Box 338
                                    Keller, TX  76244
 4                                  (817) 332-3803

 5   For Defendant Penneston:       J. Warren St. John
                                    LAW OFFICE OF J. WARREN ST. JOHN
 6                                  2020 Burnett Plaza
                                    801 Cherry Street, Unit No. 5
 7                                  Fort Worth, TX  76102
                                    (817) 336-1436
 8
     For Defendant Bell:            Rose L. Romero
 9                                  LAW OFFICES OF ROMERO KOZUB
                                    235 N.E. Loop 820, Suite 310
10                                  Fort Worth, TX  76053
                                    (682) 267-1351
11
     For Defendant Glenn:           Curt Crum
12                                  THE LAW OFFICE OF CURT CRUM
                                    1 E. Henderson
13                                  Cleburne, TX  76031
                                    (817) 645-1161
14
     For Defendant Norris:          Brian George O'Shea
15                                  6333 E. Mockingbird, Suite 147539
                                    Dallas, TX  75214
16                                  (214) 537-1475

17   For the Probation Office:      Karen Collins

18   Court Recorder:                Julie Harwell
                                    UNITED STATES DISTRICT COURT
19                                  501 W. 10th Street
                                    Fort Worth, TX  76102
20                                  (817) 850-6697

21   Transcription Service:         Kathy Rehling
                                    311 Paradise Cove
22                                  Shady Shores, TX  76208
                                    (972) 786-3063
23

24

25           Proceedings recorded by digital sound recording;
             transcript produced by transcription service.
```

1    <u>FORT WORTH, TEXAS - JULY 27, 2017 - 10:03 A.M.</u>

2          THE CLERK:  All rise.  Hear ye, hear ye, hear ye.

3  United States District Court for the Northern District of Texas

4  at Fort Worth is now in session, the Honorable Jeffrey Cureton

5  presiding.  Let us pray.  God bless these United States and

6  this Honorable Court.  Amen.

7          THE COURT:  Thank you.  Please be seated.  The Court

8  calls for preliminary and detention hearing Cause No. 4:17-MJ-

9  582, United States versus Heather Renee Dean, Jason Easley,

10 John Penneston.  Where's John?  Is that you, sir?  Thank you.

11 Also, Cause No. 4:17-MJ-589, United States versus Troy Bell.

12 Is that you, sir?

13         DEFENDANT BELL:  Yes, sir.

14         THE COURT:  Karrissa Glenn.  Thank you.  And Angel

15 Norris.

16    The Government is represented by Mr. Shawn Smith.  Is the

17 Government ready in each of these cases?

18         MR. SMITH:  Yes, Your Honor.

19         THE COURT:  Is the Government withdrawing any motions

20 to detain in this -- with the Defendants before the Court?

21         MR. SMITH:  No, Your Honor.

22         THE COURT:  All right.  So as I ask each defense

23 counsel if you are ready, I am also going to ask whether you

24 are contesting probable cause or detention at this time.  So,

25 I'll begin with counsel for Ms. Heather Dean.  Mr. Leigh Davis,

```
 1   is the Defense ready?
 2              MR. DAVIS:  The Defense is ready, Your Honor.
 3              THE COURT:  And do you wish to be heard on both of
 4   those issues?
 5              MR. DAVIS:  Yes, Your Honor.
 6              THE COURT:  Okay.  As for Mr. Easley, Counsel Anthony
 7   Green.  Is the Defense ready?
 8              MR. GREEN:  We're ready, Your Honor.
 9              THE COURT:  And are you contesting both issues?
10              MR. GREEN:  Yes, we are, Your Honor.
11              THE COURT:  As to Mr. Penneston?
12              MR. ST. JOHN:  Yes, Judge.
13              THE COURT:  Mr. St. John, is the Defense ready?
14              MR. ST. JOHN:  Yes, Your Honor.
15              THE COURT:  And do you wish to be heard on both
16   issues?
17              MR. ST. JOHN:  Yes, Your Honor.
18              THE COURT:  As to Defendant Bell, Ms. Rose Romero, --
19              MS. ROMERO:  Yes, Your Honor.
20              THE COURT:  -- is the Defense ready?
21              MS. ROMERO:  Yes, we are.
22              THE COURT:  And on both?
23              MS. ROMERO:  Yes, Your Honor.
24              THE COURT:  Thank you.  As to Ms. Glenn, Mr. Crum?
25              MR. CRUM:  Yes, Your Honor.
```

1          THE COURT:  You're ready on both?

2          MR. CRUM:  I am.

3          THE COURT:  And finally, as to Ms. Norris, Mr. O'Shea?

4          MR. O'SHEA:  Yes, Your Honor.

5          THE COURT:  Ready on both?

6          MR. O'SHEA:  Yes, sir.

7          THE COURT:  Okay.  Then, Mr. Smith, you may call your

8  first witness.

9          MR. SMITH:  The Government calls Agent McCurdy.

10          THE COURT:  Agent McCurdy, if you would please come

11  forward.  Please raise your right hand and be sworn by my

12  clerk.

13      (The witness is sworn.)

14          THE COURT:  Thank you.  You may be seated.  And

15  Counsel, you may proceed.

16          MR. SMITH:  Thank you, Your Honor.

17          MIKE MCCURDY, GOVERNMENT'S WITNESS, SWORN

18                   DIRECT EXAMINATION

19  BY MR. SMITH:

20  Q   Will you please state your name?

21  A   Mike McCurdy.

22  Q   And your current occupation?

23  A   I'm a criminal investigator with Homeland Security

24  Investigations.

25  Q   And where are you currently assigned?

1  A   I'm assigned to the Dallas HSI Office.

2  Q   And are you one of the case agents in this -- in the

3  broader case?

4  A   Yes, sir, I am.

5  Q   Can you tell us just in general what happened on July 21st,

6  before we get into any specifics of these Defendants, just kind

7  of in general what happened on July 21st?

8  A   Yes, sir.  We conducted a roundup.  We had obtained

9  multiple arrest warrants for individuals involved in an ongoing

10 conspiracy case that we've been investigating since, from the

11 investigative perspective, at least early 2014, if not longer.

12 Various teams went out and arrested -- served those warrants,

13 arrested some of those conspirators.

14 Q   And approximately how many arrest warrants were attempted

15 to be effected on July 21st?

16 A   We had approximately 83 warrants.  I believe almost 50 of

17 those were people who were at large.  So, approximately 50.

18 Q   And each -- for each defendant, there was a team assigned

19 to apprehend a certain defendant; is that right?

20 A   Yes, sir, that's correct.  A few teams had multiple

21 defendants, but it was at least one team per defendant.

22 Q   Okay.  And how many people approximately made up an arrest

23 team?

24 A   It varied.  For example, the team that I was on was

25 approximately six or seven of us.

1  Q   Okay.  All right.  And that would be sort of emblematic of

2  each arrest team who had a person to arrest?

3  A   Yes, sir.  I would believe that would be representative.

4  Each team had a team leader and then other members of the team.

5  Q   Okay.  All right.  Now, let's first talk about Case 4:17-

6  582.  I think the first defendant on that complaint is Heather

7  Dean.

8  A   Yes, sir.

9  Q   I believe her information is summarized starting on Page 6

10  of that complaint, Paragraph 13.  Can you just summarize for

11  us, please, the probable cause identified in that paragraph of

12  that complaint as it relates to Ms. Dean?

13  A   Yes, sir.  A co-conspirator by the name of Alisha Feeney,

14  who was convicted on a related case -- it's the same case for

15  us, but a related criminal case -- in 2015 identified Heather

16  Dean as a member of the methamphetamine distribution

17  conspiracy.  Specifically, Feeney stated that on multiple

18  occasions she purchased four-ounce to two-ounce quantities of

19  methamphetamine from Ms. Dean.  Additionally, she indicated she

20  saw Dean conduct drug transactions with other people.

21  Q   And it also -- the criminal complaint also identifies

22  Leslie Payne as -- also identifies Leslie Payne as providing

23  information on Ms. Dean?

24  A   Yes, sir.  That's correct.  Leslie Payne, another co-

25  conspirator, Ms. Payne was convicted in 2016, also identified

1    Ms. Dean as being involved in a conspiracy.  Specifically, Ms.

2    Payne stated that she witnessed Dean in possession of an ounce

3    of methamphetamine on approximately three occasions and 16

4    ounces of GHB, commonly known as the date rape drug, on five

5    occasions.

6    Q    Okay.  And was it sort of -- what role does GHB play

7    amongst these conspirators?

8    A    It's -- the two seem to go hand-in-hand in this

9    investigation, that almost everyone who's involved in the

10   distribution of methamphetamine is also involved in the

11   manufacture and/or distribution of GHB.

12   Q    Okay.  All right.  Now, when Ms. Dean was arrested, was she

13   -- was she arrested on July 21st as well?

14   A    Yes, sir, she was.

15   Q    All right.  Did she give a statement to law enforcement?

16   A    Yes, sir, she did.

17   Q    And what did she say?

18   A    Bear with a moment.  While I'm finding those notes, I will

19   add that at the time of her arrest, a quantity of

20   methamphetamine was seized.  She was found in a bed, and a

21   quantity of methamphetamine was seized on the nightstand next

22   to the bed.

23   Q    Do you know how much it was?

24   A    I don't have an exact amount.  I have the impression that

25   it was a small amount, but I don't have an exact amount.

1  Q   Okay.

2  A   Ms. -- in her post-arrest statement, Ms. Dean stated that

3  the most methamphetamine she had ever seen at one time was one

4  to two ounces.  Ms. Dean stated that she witnessed this

5  quantity of methamphetamine in the possession of Mr. Jason

6  Easley, another defendant in the courtroom today.  She also

7  stated that she lived with Easley in Houston, Texas for a

8  period of time.

9      Ms. Dean went on to say that she -- the largest quantity of

10  GHB she'd ever seen at one time was 24 to 32 ounces.  Ms. Dean

11  stated the largest quantity of methamphetamine she had ever

12  distributed was an eighth of an ounce.  Dean identified a

13  person she knows as Eddie or LA, Michael Whisper -- Michael

14  Heaslet, also known as Whisper, I should say -- and Ashley

15  Simpson as three of her GHB sources.  And she also stated that

16  she had received methamphetamine from an individual by the name

17  of Charles Boggs, who was also prosecuted in a previous round

18  of this investigation.

19  Q   As were Mr. Heaslet and Ms. Simpson; is that right?

20  A   As were Mr. Heaslet and Ms. Simpson.  And it's our opinion,

21  the opinion of the investigators, that the Eddie she's

22  referring to is an individual named Eddie Maldonado, who was

23  also prosecuted.

24  Q   And Mr. Maldonado was Heaslet's source for a period of

25  time; is that right?

1   A    Yes, sir.

2   Q    Do you know who took Ms. Dean's statement?

3   A    Um, --

4   Q    I mean, were you the --

5   A    Yes.

6   Q    -- one who took it?

7   A    No, sir.  I was not.  It was TFO Crum, who's one of the

8   case agents, and another task force officer.

9   Q    All right.

10        MR. SMITH:  May I approach, Your Honor?

11        THE COURT:  You may.

12    (Pause.)

13        MR. SMITH:  I've handed the witness an arrest -- a

14   local arrest report of Ms. Dean.

15  BY MR. SMITH:

16  Q    I know you're not the arresting officer on that, but can

17  you just summarize for us what -- what's was going on there the

18  day that this happened and the arresting agency?

19  A    Yes, sir.  Give me just a moment.

20    (Pause.)

21  A    So, this is a report from the Hurst, Texas Police

22  Department in January of this year.  Ms. Dean was in a vehicle

23  with two other people.  When the officers encountered her, they

24  detected a small -- a strong odor of an alcoholic beverage

25  coming from her.  Or, excuse me, coming from inside the

1  passenger compartment of the vehicle.  Ms. Dean's eyes were

2  red, watery, and her eyelids appeared -- the officer described

3  as heavy.  And she had some diminished fine motor skills.  The

4  officer also interpreted Ms. Dean's behavior as being nervous.

5  At some point during this interaction, the officers learned

6  that she had a warrant for her arrest out of Arlington, Texas.

7  She was taken into custody.  Dean gave consent for the officers

8  to search her purse.  In that purse, the officers found a pink

9  glass pipe, commonly associated with smoking methamphetamine,

10  and a bowl.  The bowl of the pipe had residue consistent with

11  methamphetamine use.

12  Q    Was that the -- was that arrest -- why were the officers

13  there at the location?

14  A    There was -- yes, I believe there was a -- I briefly caught

15  that.  There was a -- I guess the interaction was based on a

16  call the Police Department received about a female acting

17  strangely outside of a Wal-Mart.  The store manager stated he

18  believed this female might be on drugs.  At some point I guess

19  that he observed her -- the report says, I should say, he

20  observed her laying on the ground and she appeared

21  unresponsive.

22  Q    And that's in regards to Ms. Dean?

23  A    Uh, --

24  Q    Or --

25  A    The -- well, the other two -- the stop was based on that

1  information and Ms. Dean was the only female in the vehicle.

2  The other two individuals in the vehicle were males.

3  Q    Okay.

4        MR. SMITH:   May I approach, Your Honor?

5        THE COURT:   You may.

6     (Pause.)

7        MR. SMITH:   I've handed that report to Ms. Dean's

8  attorney.

9  BY MR. SMITH:

10 Q    Now, you said that Ms. Dean implicated Mr. Easley in some

11 form or fashion in her post-arrest statement; is that right?

12 A    Yes, sir.   That's correct.

13 Q    And that's the next defendant listed here, so let's just go

14 on to him, I suppose.   I think he is on the criminal complaint,

15 starts on Page -- or discusses Mr. Dean on Page 7, Paragraph

16 14.

17        THE WITNESS:   Mr. Easley?

18        THE COURT:   Mr. Easley?

19        THE WITNESS:   Mr. Easley?

20        MR. SMITH:   I'm sorry.   Mr. Easley.   Thank you.

21        THE WITNESS:   I believe that's Page 8, Paragraph 15.

22 MR. SMITH:

23 Q    Excuse me.   Page 8, Paragraph 15, yes.   Okay.   Mr. Easley.

24 Can you tell us -- can you summarize for us Paragraph 15, which

25 goes on to Page 9 as well?

1  A    Yes, sir.  Co-conspirator Eddie Maldonado, who I've

2  mentioned earlier I believe that's the same Eddie Ms. Dean made

3  reference to in her post-arrest statement, identified Jason

4  Easley as a member of the conspiracy.  Specifically, Maldonado

5  stated he had supplied eight ounces of methamphetamine to Mr.

6  Easley on behalf of co-conspirator Michael Heaslet, who I also

7  mentioned earlier.

8       Based on the search warrant, we were able to search Mr.

9  Heaslet's phone.  There was a phone number saved under the

10  contact name Jason.  That phone number is 832-593-3786.

11  There's a series of text message conversations between that

12  number, between Jason's phone and Mr. Heaslet's phone.  One of

13  the messages sent from the Jason phone to the Heaslet phone

14  reads or includes the phrase "a zip and a half."  I would add

15  that that same phone number that I just provided is also

16  associated with Mr. Easley's Facebook account.

17       Subsequent to that, we obtained a search warrant for that

18  Facebook account.  In the information we received back from

19  Facebook, we were able to locate a series of text messages

20  between Mr. Easley's account and Ms. Dean's account.  For

21  example, on March the 3rd of this year, Ms. Dean sent Mr.

22  Easley -- a message was sent from Ms. Dean's account to Mr.

23  Easley's account that reads, "I need a half of a whole one."

24  The response from Mr. Easley's account reads, "Okay.  I got to

25  run to my homeboy's shop first.  What are you going to pay?"

1   Q   So what does that sort of indicate to you what's going on

2   there?

3   A   All of those terms involve, those terms, I mean, a zip and

4   a half, a whole of a half, those are terms that are commonly

5   associated with drug distribution, drug trafficking.   So

6   they're negotiating drug deals.

7   Q   And so a half and a whole one might be a half an ounce and

8   a whole, and one whole ounce is one and a half ounces?

9   A   It's a half of a whole, so in my reading of that she's

10  asking for a half-ounce of methamphetamine.

11      Moving on to the next page for some related information, --

12  Q   And then, --

13  A   Oh.

14  Q   -- "Okay.  I've got to run to my homeboy's shop," what does

15  that indicate?

16  A   That indicates to me that Mr. Easley didn't have the drugs

17  on him, he had to go pick up the drugs from someone else.

18  Q   Okay.

19  A   Moving on to some related information on the following

20  page, we also obtained a federal search warrant for the cell

21  phone of Al Rogers.   Stored on that device was another Facebook

22  conversation between Mr. Easley's account and Mr. Rogers'

23  account.   In that conversation, there was a series of text

24  messages sent in approximately July of 2016, which was just

25  prior to Mr. Rogers being arrested on some other drug charges.

1  In that conversation, Mr. Easley sent Mr. Rogers a message that

2  reads, "Give me a call if you need some work."  The term "work"

3  is also frequently used as code language for drugs.  At another

4  point in that same conversation, Rogers asked Easley, "What you

5  wanting?"  The reply from the Easley account reads, "Just a few

6  zips."  Again, the same term that we saw used between Mr.

7  Easley and Ms. Dean.

8  Q    And a zip is an ounce of meth?

9  A    A zip is commonly used to refer to an ounce of

10  methamphetamine.  Or an ounce of drugs.

11      The next message in the series, also from the Easley

12  account, reads, "Do I need to buy more?"

13  Q    Now, there's some other information from Mr. Easley's

14  Facebook account, some more conversation between Mr. Easley and

15  Ms. Heather Dean.  Is that right?

16  A    Yes, sir, it is.

17  Q    Just -- I know there's lots of information in those

18  accounts, but can you highlight just what you think is

19  important, perhaps?

20  A    Yes, sir, if you'll bear with me a moment while I find

21  that.  (Pause.)  So, in January of this year, there was a

22  Facebook Messenger conversation between Mr. Easley's account

23  and Ms. Dean's account.  One of the messages sent from Mr.

24  Easley on January the 31st -- it's on Page 500 of the response,

25  to be precise -- reads, "We have assault rifles.  It wouldn't

1   be a good scene.  We were actually on our way to the range.  Be

2   there in about 30 minutes."

3       Several messages down, about one, two, three, four, five,

4   six, approximately six messages down, in the same conversation,

5   but it's only -- it's less than two minutes later according to

6   the timestamp, Ms. Dean sends a message that reads, "Any wawa?"

7   My interpretation of that is that she's asking for -- that's

8   another word for GHB.  The term water is commonly used.  So I

9   believe she's asking Mr. Dean for -- excuse me, Mr. Easley --

10  for GHB at that point in the conversation.

11  Q   And of course, Mr. Easley, both Mr. Easley and Ms. Dean are

12  felons; is that right?

13  A   Yes, sir.  I have reviewed their criminal histories.

14  Q   That's okay.  The Court has the Pretrial Service report.

15  We don't have to go into --

16  A   Yes, sir.

17  Q   -- that in detail.  Let's go on to Mr. Penneston, I

18  believe, is the last one on that complaint.  And he is

19  referenced in Paragraph 18 on Page 11 of the complaint.

20  A   Yes, sir.

21  Q   Can you summarize that information for us, please, as

22  relates to Mr. Penneston?

23  A   Yes, sir.  Co-conspirator Will Orozco, who was -- I

24  believe he was prosecuted in '16, but it may have been '15, on

25  a related methamphetamine case -- identified John Wesley

 1  Penneston as a methamphetamine distributor.  Specifically,

 2  Orozco stated that he, Orozco, witnessed Penneston obtain two

 3  ounces of methamphetamine from Matthew Rutledge, who was also

 4  prosecuted.  Mr. Rutledge was prosecuted in 2015.  Mr. Orozco

 5  witnessed Mr. Penneston obtain two ounces of methamphetamine

 6  from Mr. Rutledge on two occasions.  Mr. Orozco stated he

 7  observed Mr. Penneston using Rutledge's Cadillac to deliver

 8  Rutledge's methamphetamine to customers.  Additionally, Orozco

 9  stated he witnessed Penneston obtain one ounce of

10  methamphetamine from an individual by the name of Chris

11  Nicholson at Mr. Penneston's girlfriend's apartment.  Mr.

12  Nicholson was also prosecuted in a previous round of this

13  investigation.

14      Moving on, Mr. Orozco stated this transaction took place

15  while Nicholson was on the run and after Rutledge was arrested

16  in August of 2015.  Orozco --

17  Q   And Nicholson was on the -- on the run from the warrant

18  that we had for his arrest; is that right?

19  A   Yes, sir.  He was on the run from our -- from our case,

20  from our warrant.

21  Q   Go ahead.

22  A   Mr. Penneston witnessed -- or, excuse me, Mr. Orozco

23  witnessed Mr. Penneston in possession of multi-ounce quantities

24  of methamphetamine on multiple occasions.  Orozco stated that

25  on two occasions he witnessed Penneston in possession of a

1  black Sig pistol while Mr. Penneston was participating in drug-

2  related activities.

3       Co-conspirator Leslie Owens confirmed that Mr. Penneston

4  was involved in drug distribution, methamphetamine

5  distribution.  Specifically, Owens stated on a daily basis for

6  approximately a three-month period, she witnessed Penneston

7  deliver four-ounce quantities to Al Rogers, who I mentioned

8  earlier when I was discussing Mr. Easley and Ms. Dean.

9  Q    Now, I believe Mr. Penneston gave a statement when he was

10 arrested as well; is that right?

11 A    Yes, sir.  He did.  I interviewed him.

12 Q    Okay.  What did Mr. Penneston say?

13 A    He acknowledged soliciting Matthew Rutledge for drugs but

14 he claimed that Mr. Rutledge never actually provided him the

15 drugs.  Bear with me a moment while I find those notes.

16 (Pause.)  There we are.  Mr. Penneston stated that he first

17 used methamphetamine in approximately 2012 or 2013.  He

18 identified his -- his mother is a woman by the name of Kelly

19 Dwyer.  I'll return to her in a moment.  When asked about the

20 largest quantity of drugs he'd ever seen in any one place at

21 any one time, Mr. Penneston said that was eight ounces.  And I

22 believe that was related to an older event in -- I don't recall

23 the exact time frame, actually, but it was an older event.

24      More recently -- let me back up.  I misspoke earlier.  The

25 most, the largest quantity of drugs Mr. Penneston stated that

1  he ever obtained from Mr. Rutledge was $30 or $40 quantities.

2  We asked -- what I asked him about was making deliveries for

3  Mr. Rutledge, and Mr. Penneston indicated that Rutledge would

4  not allow him to make the deliveries.  However, we have text

5  messages from Mr. Rutledge's phone that are consistent with

6  them conducting transactions.

7      Back to Mr. Penneston's statement.  The most recent

8  transaction that he discussed was he middled a deal sometime --

9  Q    What?  Oh, middled?

10 A    He middled, where he facilitated a drug transaction

11 sometime in the last six months.  I believe it was towards the

12 beginning of 2017.  And that was for approximately one-eighth

13 ounce of methamphetamine.

14 Q    So did it appear to you -- you said something about his

15 mother?  Was that relevant?

16 A    Yeah.  I'm glad you reminded me.  That most recent

17 transaction involved her.  She handed the drugs to Mr.

18 Penneston and he handed the drugs to a gentleman by the name of

19 Danny Floyd.

20 Q    So his mother was the source?

21 A    Yes.  In that transaction.

22 Q    All right.  All right.  Now, Mr. Rutledge -- it appears

23 from what you're saying that Mr. Penneston was minimizing his

24 involvement to some extent.  Is that fair?

25 A    That's -- that was my interpretation of, yes, of the

1  interview.

2  Q    Okay.  And Mr. Rutledge, was he at that time -- when he was

3  arrested, was he a member of the Aryan Brotherhood?

4  A    Mr. Rutledge?  Yes, sir.

5  Q    And does Mr. Penneston have any affiliation?

6  A    It's my understanding -- yes, he certainly has some

7  affiliation.  It's my understanding that he is a -- at one

8  time, he was a prospective member, but he was not allowed to

9  formally join the organization.

10 Q    Okay.  All right.  Now, before I move on to the next

11 complaint, I just want to ask kind of a broader question.  Is

12 it common in this conspiracy for people to come in and out of

13 state and local custody and to get arrested, make bond, that

14 sort of thing, and then start dealing as soon as they get out?

15 A    Constantly.  People are constantly in and out of police

16 custody.  So the roles of who's interacting with who changes on

17 a regular basis.

18 Q    All right.  Now, let's move on to the next complaint, which

19 is -- I think the first defendant here is Troy Bell.  That's in

20 4:17-MJ-589.

21 A    Yes.

22 Q    Do you have that there in front of you, --

23 A    Yes, sir, I do.

24 Q    -- the criminal complaint?  Okay.  All right.  Let's talk

25 about Mr. Bell first.  Let's see.  I believe he's discussed

1  beginning on Paragraph 12, Page 5, which has -- which continues

2  on to Page 6.  And I believe that's it.  So, can you summarize

3  for us kind of what's going on, the information we have as it

4  relates to Mr. Troy Bell's drug trafficking activities?

5  A    Yes, sir.  A co-conspirator who was prosecuted on a related

6  case by the name of Lee Baker identified Troy Bell as one of

7  his, one of Baker's methamphetamine customers.  Let me restate

8  that.  Baker said that he witnessed Dustin Bell distribute

9  between one-eighth and one-sixteenth ounce of methamphetamine

10 to Troy Bell on two or three occasions.

11 Q    Are they related?

12 A    It's my understanding they're brothers.  I'm not 100

13 percent on that, but I believe Mr. Baker described them as

14 brothers.

15 Q    Okay.  Go ahead.

16 A    Baker also stated he witnessed Troy Bell in possession of

17 an eighth ounce of methamphetamine, or a quantity between one-

18 eighth and one-quarter ounce of methamphetamine on three

19 additional occasions.  Another co-conspirator who was

20 previously prosecuted, Jonathan Ruckman -- actually, I don't

21 believe Mr. Ruckman spoke about Troy Bell.  However, co-

22 conspirator Mandy Turner, who was prosecuted last year on a

23 related case, confirmed that Troy Bell was involved in

24 methamphetamine distribution.  Specifically, Turner stated she

25 witnessed Troy Bell weighing between three and four ounces of

1  methamphetamine on five occasions and one to two ounces of

2  methamphetamine on three additional occasions.  And I believe

3  that was older information that was further back in history,

4  the information that she talked about.  Approximately -- I want

5  to say approximately 2011, 2010-2011, for -- regarding Ms.

6  Turner's statement.

7  Q    Versus the information that Baker provided?

8  A    I believe the information that Mr. Baker provided would

9  have been more recent.

10       Moving on, another co-conspirator, Lauren Moore, identified

11  -- Ms. Moore was previously prosecuted -- identified Troy Bell

12  as a methamphetamine distributor who she had witnessed in

13  possession of three ounces on one occasion.  Ms. Moore admitted

14  that she had obtained a quarter-ounce on one occasion from Troy

15  Bell.  And she also stated that she had witnessed Troy Bell

16  deliver one-eighth ounce of methamphetamine on one occasion.

17  On a -- additionally, Ms. Moore witnessed Troy Bell in

18  possession of one-half ounce of methamphetamine.

19  Q    Okay.  And Mr. Bell has multiple felony convictions; is

20  that right?

21  A    Yes, sir.  According to the information I have in front of

22  me, convictions for -- at least one conviction for theft, three

23  for possession of a controlled substance, two for unlawful

24  possession of a firearm by a felon, another for burglary of a

25  building, and one for evading arrest or detention with a

1  vehicle.

2  Q   Okay.  All right.  Let's move on to Ms. Glenn.  She is

3  referenced in or discussed in -- she'd discussed a little bit

4  in Paragraph 12, it looks like, on Pages 5 and 6.  Is that the

5  extent of it?  Am I missing -- I think that's it.  Page --

6  sorry.

7  A   In regards to the complaint, I only see Pages 5 and 6.

8  Q   Okay.  Go ahead.  I think you -- I should have asked you to

9  summarize her information, too, when you talked about Mr. Bell.

10 So it looks like Dustin Bell, Troy Bell, and Karrissa Glenn

11 kind of worked together to some extent.  Is that right?

12 A   According to the information provided by Mr. Baker, yes.

13 Well, Mr. Baker detailed Dustin Bell and Troy Bell working

14 together.  Mr. Ruckman, who I also mentioned earlier, detailed

15 Dustin Bell and Ms. Glenn working together.

16 Q   Okay.

17 A   Mr. Ruckman stated that he -- that Dustin Bell was one of

18 his methamphetamine sources of supply in 2015, and that Ms.

19 Glenn accompanied Dustin Bell on transactions.  Specifically,

20 Mr. Ruckman stated that on at least 15 to 20 occasions, Ruckman

21 purchased one ounce of methamphetamine from Dustin Bell.

22     More to the point on Ms. Glenn, Lauren Moore, who also

23 provided information about Troy Bell, identified Dustin Bell

24 and Ms. Glenn as methamphetamine distributors.  She witnessed

25 -- distribute quarter-ounce on one occasion to Katherine

1    Markel, who is charged in a related case on this round.   She

2    also stated she witnessed Dustin Bell and Ms. Glenn in

3    possession of one and a half ounces of methamphetamine on that

4    same occasion.

5    Q    And along with Mr. Bell -- Mr. Bell was arrested, too, on

6    July 21st.   Is that right?

7    A    Troy Bell was.   Dustin Bell was --

8    Q    I'm sorry.   Troy Bell.   And Ms. Glenn was also arrested on

9    that same day?

10   A    Yes, sir.

11   Q    Did she make a statement?

12   A    Yes, sir.   She did.

13   Q    And what did Ms. Glenn say?

14   A    This is another interview that I did not participate in but

15   I do have a draft copy of the report in front of me.   Ms. Glenn

16   stated that she first used methamphetamine at age 15.   She said

17   -- she admitted to delivering methamphetamine at the direction

18   of an individual named Michael Brabson, who I believe is the

19   father of her child.   She delivered those drugs to multiple

20   customers, including R.V. Kerr, Jonathan Ruckman, who I

21   mentioned earlier, Rachel Adams, and an unknown Hispanic male.

22   In addition to Mr. Ruckman, Ms. Adams and Mr. Kerr have also

23   been charged in related cases.   And convicted.

24   Q    So she kind of confirmed what Ruckman and I believe Moore

25   had said about her activities?

```
 1  A    Yes.   Yes.   It would seem to corroborate the information
 2  from the other interviews.
 3  Q    Okay.
 4  A    Ms. -- at one point in the interview, Ms. Glenn admitted
 5  that on approximately five occasions she delivered one-half
 6  ounce quantities of methamphetamine to Mr. Ruckman at the
 7  direction of Mr. Brabson.   She also gave some details of the
 8  other deliveries to Mr. Kerr and Ms. Adams, again,
 9  corroborating information from the other statements.
10  Q    Okay.
11  A    If you'll bear with me one moment, I have one more piece of
12  relevant information on that. (Pause.)  We can come back to it.
13  I can address it later.
14  Q    Do you need more time to look for the information?
15  A    I can address the other information later.
16  Q    Okay.  All right.  Let me --
17          MR. SMITH:  May I approach, Your Honor?
18          THE COURT:  You may.
19  BY MR. SMITH:
20  Q    Will you please review that report and just kind of
21  summarize what's going on there --
22  A    Yes, sir.
23  Q    -- as relates to Ms. Glenn?
24      (Pause.)
25  A    So, this is a Fort Worth Police Department report from
```

 1  April 2, 2015 related to a traffic stop that occurred.  The

 2  report lists the driver of the vehicle involved in the traffic

 3  stop as a Nicholas Bell.  It lists Ms. Glenn as a passenger of

 4  the vehicle who was arrested.  Another passenger of the vehicle

 5  by the name of Jackie Ohler.  And Dustin Bell, who I mentioned

 6  earlier, is listed as a witness.

 7          THE COURT:  What's the date on that?

 8          THE WITNESS:  April 2, 2015.

 9          THE COURT:  Thank you.

10          THE WITNESS:  The traffic stop led to a search of the

11  vehicle.  During the search of the vehicle, the officer

12  encountered a backpack in the back seat.  When the officer --

13  Ms. Glenn was sitting next to the backpack.  Ms. Glenn stated

14  that her mother packed the backpack for her.  The officer asked

15  her if it was her backpack, and she said yes.  When the officer

16  searched the backpack, he found a glass pipe with some burnt

17  markings, two spoons, some empty syringes.  There was a

18  quantity of methamphetamine discovered that the officers

19  weighed out at .2 grams.

20  Q   So that's kind of a use quantity?

21  A   It's a very small quantity.

22  Q   And she indicated, or at least the report indicates that

23  she told officers that her mother packed the bag?

24  A   Yes, sir.  My mom packed the -- the -- in quotes in the

25  report is a statement from Ms. Glenn that reads, "My mom packed

1   that backpack for me."

2   Q    Okay.  But she was -- and she was arrested from that?

3   A    Yes.

4   Q    At least the report indicates that?

5   A    Yes.  She --

6   Q    But at that traffic stop, she was in the car with Dustin

7   Bell?

8   A    He's listed as a witness.  Let me see.  (Pause.)   Mr.

9   Bell, Dustin Bell, actually walked up to the traffic stop on

10  foot.  So he was not in the vehicle at the time.  Mr. Bell

11  walked up and spoke with officers.  He told the officers that

12  all of the occupants of the vehicle were out driving around

13  looking for him since he got in a verbal argument with his

14  girlfriend.

15  Q    And that would have been Ms. Glenn at the time?

16  A    The report doesn't specifically say that that I see, but

17  that's -- our understanding is that they were boyfriend-

18  girlfriend during that time period.

19  Q    Do you recognize any of the other names in the arrest

20  report?

21  A    There's a Nicholas Bell listed as the driver.  It's

22  obviously the same last name as Dustin Bell and Troy Bell, but

23  I'm not familiar with Nicholas.

24  Q    Okay.

25            MR. SMITH:  May I approach, Your Honor?

 1                THE COURT:  You may.  Thank you.

 2                MR. SMITH:  And I've handed Ms. Glenn's attorney that

 3   report.

 4   BY MR. SMITH:

 5   Q    Let's -- I think the last defendant here is Angel Norris.

 6   A    Yes, sir.

 7   Q    Let's talk about Ms. Norris a little bit.  And it looks

 8   like he is -- some information is summarized about him --

 9   A    Her.

10                THE COURT:  Her.

11                MR. SMITH:  -- on Paragraph --

12                THE COURT:  Are you talking about Ms. Norris?

13                MR. SMITH:  I'm sorry.  Her.  Angel Norris.  Sorry.

14   Angel Norris.  On Paragraph 17, Page 9.  Is that right?

15                THE WITNESS:  Yes, sir.

16   BY MR. SMITH:

17   Q    All right.  Can you tell us a little bit about Ms. Norris'

18   drug trafficking activities identified in that paragraph?

19   A    Yes, sir.  Co-conspirator Lee Baker, who I mentioned

20   earlier, identified Angel Norris as a methamphetamine

21   distributor.  Mr. Baker witnessed Dustin Bell distribute one-

22   quarter to one ounce -- one-quarter to one-half ounce

23   quantities of methamphetamine to Norris on more than five

24   occasions.  Baker stated he had also witnessed Norris obtain

25   four ounces of methamphetamine on three occasions from another

1  individual by the name of Lacey Whisenant, who was prosecuted

2  on a related case.  Mr. Baker and Ms. Whisenant were partners

3  in the drug trade for a period of time.

4      Separately, another co-conspirator by the name of Michael

5  Stepich confirmed that Norris was involved in drug

6  distribution.  Specifically, Stepich stated that he had seen

7  Norris with three ounces of methamphetamine on one occasions,

8  two ounces on two occasions, and one ounce of methamphetamine

9  on 10 to 15 occasions.  Stepich also stated that he had sold

10 Norris one-quarter ounce of methamphetamine on one occasion.

11 Q   All right.  Let's --

12         MR. SMITH:  May I approach again, Your Honor?

13         THE COURT:  You may.

14         MR. SMITH:  And I'm handing the witness another Fort

15 Worth Police Department report.

16 BY MR. SMITH:

17 Q   Will you please review that and tell us what's going on

18 there?  Identify the date and the location.

19 A   Yes.  I'm actually familiar with this one.  This is a Fort

20 Worth Police Department report dated December 17, 2015.  It

21 relates to a traffic stop.  There were four vehicles -- four

22 people, rather, in the vehicle that was stopped.  A Billy

23 James, Tiffany Cavanaugh, Rick Disney, and then Ms. Norris.

24 During a consent search of the vehicle after all the occupants

25 exited, officers located a digital scale with five clear

 1  plastic baggies inside of a purse.  Both Ms. Norris and Tiffany

 2  Cavanaugh advised that that purse belonged to Ms. Norris.

 3  Inside of Ms. Norris' pants, the officers discovered a clear

 4  glass pipe with white residue wrapped inside of a bandana that

 5  the officers associated with methamphetamine use.  One of the

 6  officers also discovered a clear plastic bag containing

 7  methamphetamine in Ms. Norris' underwear.  That methamphetamine

 8  weighed approximately 26 grams, or almost an ounce.

 9           MR. SMITH:  May I approach, Your Honor?

10           THE COURT:  You may.

11           MR. SMITH:  I'm handing that to Ms. Norris' attorney.

12  BY MR. SMITH:

13  Q   Now, there's also some other information as it relates to

14  Ms. Norris I believe off of some Facebook accounts.  Can you

15  discuss that for us?

16  A   Yes, sir.  We also obtained a federal search warrant for

17  Ms. Norris' account, just like Mr. Easley's.  We just recently

18  obtained that one.  I've only had opportunity to review a

19  portion of that account.  But I have discovered several

20  conversations involving drug transactions or drugs.

21  Specifically, the information I mentioned earlier was a

22  Facebook Messenger conversation between Ms. Norris and Ms.

23  Glenn.

24  Q   Karrissa Glenn?

25  A   Karrissa Glenn, the co-defendant.  In a conversation dated

1 | March the 12th, 2015, Ms. Glenn sends Ms. Norris a message that
2 | reads, "I need some shit."  A few months later, in May of 2015,
3 | a message is sent from Ms. Norris' account to Ms. Glenn's
4 | account that reads, "Got fire."  Both of those terms in this
5 | context, shit and fire, are, in our experience, in my
6 | experience, are code languages for drugs.  For methamphetamine
7 | in particular.

8 |     Later in the same month, another message -- so, the date of
9 | this conversation is May the 29th, 2015.  A message is sent
10 | from Ms. Glenn's account to Ms. Norris' account that reads,
11 | "You got any shit?"  The reply from the Norris account is,
12 | "Yeah, how much do you all need?"

13 |     The next message in that conversation, which is early in
14 | the morning hours of the following day, May the 30th, 2015,
15 | from Ms. Glenn reads, "I have a solid silver chain."  My
16 | interpretation of that is that she was offering to pay for the
17 | drugs with a piece of jewelry, that Ms. Glenn was offering to
18 | pay for the drugs with a piece of jewelry.

19 | Q   Is there more recent things on Ms. Norris' account?

20 | A   Yes.

21 | Q   That's kind of historical information that kind of
22 | corroborates what you've already testified to; is that right?

23 | A   That's correct.  (Pause.)  In a conversation found in Ms.
24 | Norris' account during the time period of late May 2016, so
25 | roughly a year later than the last messages I just mentioned, a

1  message was sent from the account of Bryan Manous to Ms.

2  Norris' account that reads -- well, let me back up one.  The

3  Norris account, Ms. Norris sent a message that reads, "Whatcha

4  doing?"  Mr. Manous replies, "Pimping. You?"  Ms. Norris then

5  sends a message that says, "Trying to make some money.  I've

6  got some A-1."  Again, I would also describe A-1 as code

7  language for drugs.

8  Q   Do you know that individual that Ms. Norris was talking

9  about?  Or talking to, I mean.

10 A   Talking to?  Ryan Manous?  His name is familiar to the

11 investigation.  He hasn't been charged by us, but I recognize

12 the name.

13     Let me fast-forward to I believe it's approximately

14 September of last year.  There is a -- on September 23rd of

15 2016, there's a message sent from the Facebook account of Mary

16 Mayfield, who is also familiar to the investigation, to Ms.

17 Norris that reads, "Hey, girl.  You got anything?  This is me,

18 Mary.  I got some cute clothes and new bottle of perfume and

19 new purse."  The reply from Ms. Norris' account is, "Yeah.

20 Give me a few.  I will call you back.  I'm off Cherry Lane.

21 You'll have to come to me."

22     The next message from Ms. Mayfield, continuing the

23 negotiation, is, "Where will that be?  I'll come to you, girl.

24 My old man has caught fever.  I'll hook you up, though.  Got a

25 bunch of cute stuff."  My interpretation of that conversation,

1   much like the other one I described earlier, is she's offering

2   to trade items for the drugs.

3       Additionally, in a -- to back up a few months to May of

4   2016 again, in a conversation between Ms. Norris' account and

5   the account of Conner Bryce, who is also known to the

6   investigation, Ms. -- a message was sent from Ms. Norris'

7   account to the Bryce account that reads, "Say, I need you to

8   smash on this little shit-talking bitch named Brittany.  I'm

9   fixing to pop her.  I would."  And the reply from Ms. Bryce is,

10  "Okay.  Brittany who?  I will, babe.  I got you."

11  Q    What does that indicate?

12  A    That Ms. Norris is soliciting assault, an assault on

13  someone.  I don't know if it was drug-related or not.

14  Q    Was there an event, a conversation in October of 2016 that

15  was --

16  A    That is what I'm trying to find now.  (Pause.)  While I'm

17  looking for it, I will -- I'll summarize it from memory.  I

18  just reviewed it last night.  It's -- there's a drug-related

19  Facebook Messenger conversation between Ms. Norris' account and

20  the account of an individual named Angela Hardy discussing drug

21  transactions.  And this is in approximately September or

22  October of 2016.  And in the conversation, Ms. Norris mentioned

23  that she had her baby with her.  I'm still trying to find that

24  particular conversation, though.

25      (Pause.)

1  A    This is not the conversation I just described, but it is a

2  more recent conversation in October -- dated October the 18th,

3  2016.   It's a conversation between Ms. Norris' account and an

4  individual by the name of Jeremy Baxton Dickinson.   I am not

5  familiar with him.   The Norris account sends a message that

6  reads, "Hey, can you get me some shit?"   Mr. Dickinson replies,

7  "How much?"   The next message from Mr. Dickinson reads, "I got

8  it."   The next message from -- sent from the Norris account

9  reads, "Can I get two for 50?"

10 Q    I think that's enough.   I think we understand.

11 A    Yes, sir.

12 Q    All right.

13       MR. SMITH:   I don't have any further questions, Your

14 Honor.

15       THE COURT:   Okay.   Let's move to cross-examination.

16 And we'll start at the front.   Mr. Davis, do you have any

17 cross-examination?

18       MR. DAVIS:   May I have just one brief second --

19       THE COURT:   You may.

20       MR. DAVIS:   -- to talk to my client, Your Honor?

21       THE COURT:   You bet.

22    (Pause.)

23       MR. DAVIS:   Your Honor, just a few questions, if I

24 could.

25       THE COURT:   You may.

1                          CROSS-EXAMINATION

2    BY MR. DAVIS:

3    Q    Sir, with respect to the quantity of methamphetamine found

4    when Ms. Dean was arrested, do you have enough information to

5    be able to characterize it as a user quantity or a

6    distribution-level quantity?  Or can you say?

7    A    Bear with me a moment, please.

8    Q    Certainly.

9        (Pause.)

10   A    I believe I said earlier, but just to clarify in case I

11   didn't, I was not present for Ms. Dean's arrest.  A team from

12   Texas DPS arrested her.  So I have a draft copy of their report

13   that I reviewed.  They describe the drugs that were found as "a

14   small baggie of crystal-like substance believed to be

15   methamphetamine."

16   Q    Okay.  So no more information than that?

17   A    That's all I have at this point.

18   Q    Okay.  Did you describe some Facebook Messenger messages

19   between Ms. Dean and Mr. Easley?

20   A    Yes, sir.

21   Q    And you may have said it and I missed it, but when did

22   those occur?  What kind of time frame were we talking about

23   there?

24   A    I believe the most recent conversations were in March or

25   April of this year.

McCurdy - Cross                                          36

1    Q    Okay.  And were those conversations the ones about what you

2    believed was code language for drug transactions?

3    A    I'll have to double-check.

4        (Pause.)

5    A    There is -- I don't -- I'm not sure -- I don't believe,

6    actually, that this was the exact message that I mentioned

7    earlier, but there is a message from -- sent from Ms. Dean to

8    Mr. Easley on May the 6th of this year that reads, "Does anyone

9    out here mess with that wawa?"  And as I described wawa

10   earlier, that's generally code language for GHB.

11   Q    And that's a message from Ms. Dean to Mr. Easley?

12   A    Yes, sir.

13   Q    Okay.  And how did -- read it again.

14   A    "Does anyone out here mess with that wawa?"

15   Q    Why would she phrase something that way if it was directed

16   to a specific individual?  I mean, doesn't that strike you as

17   odd?

18   A    I would interpret that two possible ways.  My

19   interpretation of that is either that she's looking to buy some

20   or she's looking to sell some.  She's either looking for a

21   source or she's looking for customers.

22   Q    Okay.  But why would she phrase it that way if it was

23   directed specifically to one individual?

24   A    My interpretation would be that she's hoping that he can

25   broker some transactions, she can introduce him either to a

1   source of supply -- he can introduce her, rather; I misspoke --

2   he can introduce her to either a source of supply or some

3   customers.

4   Q    And prior to that message, when was the last message

5   between the two of them that you would characterize as a

6   narcotics transaction type message --

7   A    Hmm, --

8   Q    -- or communication?

9   A    There are a lot of conversations between the two.

10  Q    When was the most recent one prior to that May one you just

11  related?

12  A    I don't have the entire account with me, but I will review

13  my notes, but understand that the -- on this particular

14  account, the return we received from Facebook is over 2,900

15  pages.

16       (Pause.)

17       THE COURT:   Understanding you're going to get all of

18  these, is the question relevant --

19       MR. DAVIS:   Well, --

20       THE COURT:   -- to like how often they were happening

21  or just the most recent?  I want to make sure we're using our

22  time effectively.

23       MR. DAVIS:   No, and I can understand that, Your Honor.

24  Maybe I -- let me -- I guess the point of that is with respect

25  to recent activity as it would pertain to whether my client

1  should be detained or not, --

2           THE COURT:  Okay.

3           MR. DAVIS:  -- is really where I'm going with that.

4           THE COURT:  Okay.

5           MR. DAVIS:  So let me --

6           THE WITNESS:  If I may?

7  BY MR. DAVIS:

8  Q    Please.

9  A    I did find the message I described earlier.

10 Q    Yes.

11 A    I can't say that it's the -- there may be other messages

12 between the one that I just detailed to you and the one that I

13 described earlier during my initial testimony, but the message

14 I detailed initially when Ms. Dean sends a message that says,

15 "Any wawa?" is dated January 31st of this year.

16 Q    Of this year?  Okay.

17 A    But again, there may be additional messages between those

18 two that I don't have in front of me.

19 Q    Okay.  All right.  Well, thank you.

20          THE COURT:  Thank you.

21 BY MR. DAVIS:

22 Q    And then with respect to this January, what is it, 17th

23 incident in Hurst, are you aware that that was no-billed by a

24 Tarrant County grand jury on April 24th?

25 A    No, sir, I was not.

1  Q   Okay.

2          THE COURT:   On both -- let's see.   There were two

3  possession of controlled substance charges.

4          MR. DAVIS:   Yes, sir.   Possession less than one ounce

5  and --

6          THE COURT:   The whole thing was no-billed?

7          MR. DAVIS:   Both of them.   Yes, Your Honor.

8          THE COURT:   Thank you.

9          MR. DAVIS:   I'll pass the witness, Your Honor.

10          THE COURT:   All right.   Cross-examination, Mr. Green?

11          MR. GREEN:   Thank you, Your Honor.   I'll be brief.

12                        CROSS-EXAMINATION

13  BY MR. GREEN:

14  Q   Mr. Easley is not on parole or probation at this time, is

15  he?

16  A   Not to my knowledge.

17  Q   Okay.   And where did you arrest Mr. Easley?

18  A   I wasn't present.   A DPS team arrested him I believe in

19  Roby, Texas, out north of Abilene somewhere.

20  Q   Do you know what he was doing out there?

21  A   I don't.

22  Q   Okay.   Would it surprise you if he was at his workplace?

23  A   No, it would not.

24  Q   Okay.   And Mr. Easley was not with Ms. Dean when she was

25  arrested?

 1  A    Correct.

 2  Q    Okay.  Did you record the interview with Ms. Dean when she

 3  allegedly implicated Mr. Easley in this offense?

 4  A    I wasn't present but I can review the notes.

 5  Q    Please.

 6       (Pause.)

 7  A    Mr. Green, I only have a draft copy of the report in front

 8  of me, but I don't see any mention of a recording.

 9  Q    Thank you, sir.  And in the text, I believe you said

10  January 31st, between Mrs. Dean and Mr. Easley about the wawa,

11  you called it?

12  A    Fortunately, I've saved that page so I don't have to look

13  again.  Yes, sir.

14  Q    Okay.

15  A    That's a --

16  Q    You knew I'd go there.  He doesn't write back saying, "I'll

17  go get you some" or something, does he?  To that effect?

18  A    So, the next response from Mr. Easley in that conversation,

19  there's a series of several from Ms. Dean, including the one

20  with "Any wawa?", there's a reply from Mr. Easley in that same

21  conversation, same day, "Yes wawa.  Don't know about the days,

22  but it's considerably colder here.  You can get rest on next

23  trip."

24  Q    Uh-huh.

25  A    So the beginning portion of that, in case I spoke too

1  quickly, is "Yes wawa."

2  Q    "Yes wawa?"

3  A    Yes.

4  Q    Okay.  But he doesn't specifically say he's going to go get

5  that for her or anything, does he?

6  A    My interpretation of that is that -- again, I'm not certain

7  about the context, whether she's looking for customers or a

8  source of supply, --

9  Q    Uh-huh.

10  A    -- but I interpret your client's response that he can

11  facilitate that.

12  Q    Okay.  The thing about the gun, the assault rifles, nobody

13  says they saw Mr. Easley with an assault rifle, did they?

14  A    Are you referring to the message I described?

15  Q    Yeah.  There's another message, another Facebook message

16  about going to the range.

17  A    It's during that same conversation, same day, January 31st

18  of this year, --

19  Q    Uh-huh.

20  A    -- when Mr. Easley sends a message that says, "We have

21  assault rifles.  It wouldn't be a good scene.  We were actually

22  on our way to range.  Be there in about 30 minutes."  "30

23  mins."

24  Q    Nobody's -- but you don't have any other information that

25  somebody actually saw him with a gun?  Or you didn't catch him

1   with a gun, did you?

2   A   Are you talking -- he was not arrested with a gun.

3   Q   Okay.

4   A   You're talking about the case overall?

5   Q   Yes.  I didn't see it in the complaint and that's why I'm

6   kind of interested there.

7       (Pause.)

8   A   There is a -- bear with me.  I'm looking for a particular

9   conversation between Mr. Easley and a person who I believe is

10  one of his -- we would describe as one of his methamphetamine

11  customers. (Pause.)  So, I have not reviewed this entire

12  account, but the incident that I was thinking of, I don't see

13  any mention of a gun.

14  Q   Okay.

15  A   So, to try to answer your question better, at this point I

16  can't think of anyone else associating with him -- other than

17  him associating himself, I can't think of anyone else who

18  associates him with a firearm.

19  Q   Thank you.

20  A   Yes, sir.

21  Q   And then our next obvious question is, did the arresting

22  officers catch Mr. Easley with any methamphetamine during this

23  conspiracy?

24  A   When he was picked up on our case?  No, sir.

25  Q   Okay.  Or any other illegal drug?

1  A    No, sir.

2  Q    All right.  You talked earlier about a text -- and forgive

3  me, I kind of missed part of it -- but it was to a man named

4  Jason.  Between Mr. Easley and Jason?

5  A    No.  Mr. Easley being Jason.  So it was between -- I

6  believe we have two series of messages.  Is that in the -- are

7  you referring to information in the complaint?

8  Q    No.  It was just earlier in your testimony.

9  A    Well, just to be sure, in the complaint, Paragraph 15, --

10 Q    Uh-huh.

11 A    -- it talks about a series of text messages between the

12 phone of Michael Heaslet, who received a life sentence on a

13 related --

14 Q    Yes, he did.

15 A    -- a related conviction, and the phone number that's saved

16 as Jason.  And I will say that that number that's associated

17 with Jason, the number that I read earlier, is the same phone

18 we pinged, the same phone number we pinged to locate your

19 client.

20 Q    Okay.  And when did these texts occur?

21 A    I believe it was roughly late 2015/early 2016.

22 Q    Okay.  And did you have a warrant to search Mr. Easley's

23 phone?

24 A    We got that information from Mr. Heaslet's phone.

25 Q    Okay.  Did you have a warrant to search his phone?  From

1  Heaslet's phone?

2  A   Yes, sir.  A federal search warrant.

3  Q   Okay.  And do you know for a fact that that number is Jason

4  Easley's phone?

5  A   I'm quite confident it's Mr. Easley's phone number.

6  Q   How do you know that?

7  A   It's associated with his Facebook page and we used it to

8  locate him.

9  Q   Okay.  In the complaint, you don't state a connection

10  between Mr. Easley and a lot of the other people like Mr.

11  Penneston, Mr. Rutledge, Owens, Shaw, Nicholson.  Is that

12  correct?

13  A   This is a very large -- I'll answer it this way.  This is a

14  very large conspiracy.  Every member is not necessarily related

15  to every other member.

16  Q   Okay.  That's -- all right.  Thank you.

17  A   Yes, sir.

18         MR. GREEN:  Pass the witness.

19         THE COURT:  All right.  Mr. St. John, do you wish to

20  have cross-examination?

21         MR. ST. JOHN:  I have no questions.

22         THE COURT:  Very good.  Mr. -- or Ms. Romero, on

23  behalf of Mr. Bell, do you have cross-examination?

24         MS. ROMERO:  Yes, Your Honor.  Briefly.

25         THE COURT:  You may proceed.

1                          CROSS-EXAMINATION

2   BY MS. ROMERO:

3   Q   Yes.  I'm sorry.  You mentioned multiple felony convictions

4   on Mr. Bell; is that correct?

5   A   Yes, ma'am.

6   Q   Okay.  And most of those felony convictions are pretty old,

7   aren't they?  Fifteen, sixteen, seventeen years old?  Is that

8   right?

9   A   I will have to find his criminal history.  I have it with

10  me.

11      (Pause.)

12  Q   Do you have a copy with you, or do you need a copy?

13  A   I have a copy.

14  Q   Okay.

15  A   I'm reviewing it now.  It took me a while to get to the

16  end.

17          THE COURT:  He doesn't have the Pretrial Services

18  report.

19          MS. ROMERO:  Oh, okay.

20          THE COURT:  He just has the NCIC.

21          MS. ROMERO:  Okay.

22          THE COURT:  That's why he's flipping so much.

23          MS. ROMERO:  Oh, okay.  I'm sorry.

24          THE WITNESS:  Yeah.  I apologize.  We don't see those

25  reports.

 1          MS. ROMERO:  Oh, that's okay.

 2          THE COURT:  But Ms. Romero, my Pretrial Services

 3   report shows there was a possession of controlled substance in

 4   2010, where three years were -- the sentence was three years.

 5   That's on Page 5 as to Mr. Bell.  So I want to make sure you've

 6   got all the same information.

 7          MS. ROMERO:  Right.  Right.  I do.

 8          THE COURT:  Oh, okay.  Go ahead.

 9          MS. ROMERO:  I do.  I do.  But many --

10          THE COURT:  You were saying the majority?

11          MS. ROMERO:  But many of them, most of them, --

12          THE COURT:  Gotcha.

13          MS. ROMERO:  -- are 13, 14, 15 years old.

14          THE COURT:  I understand.  Thank you.

15          MS. ROMERO:  Okay?

16   BY MS. ROMERO:

17   Q    And the possession of the controlled substance in 2010, if

18   you have that in front of you -- if not, I can show you this so

19   that we can save time -- is under one gram.  Is that correct?

20   A    That's what I'm looking at.  Yes, ma'am.

21   Q    And one gram is a user quantity, is it not?  Under one

22   gram?

23   A    It is -- I would describe it as a distributable quantity.

24   Q    Really?  A distributable -- under one gram is a

25   distributable quantity?

1  A    Absolutely.

2  Q    Okay.   So, and then another thing about this criminal

3  history -- and you may not be aware of this, but I'll ask you

4  anyway -- there is some double-counting here according to

5  Probation.   They took one off because it was double-counted.

6  So there's some confusion about this long criminal history.

7  Are you aware of any of that?

8  A    No, ma'am.

9  Q    Okay.

10  A    Again, we don't see those reports.

11  Q    Okay.

12  A    Sorry.

13  Q    And one other thing on the criminal history.   His evading

14  arrest, I believe that was a 2005 case.   Is that what you have

15  in front of you?

16  A    I see --

17  Q    Was a failure to identify.

18  A    I see a conviction in 2005 for evading arrest or detention

19  with a vehicle.

20  Q    Yeah.   Okay.   Now, you mentioned that -- first of all, let

21  me ask you, you talked about phone calls and Facebook messages

22  and text messages.   Did you have any of that evidence during

23  your investigation on Mr. Bell, Mr. Troy Bell?

24  A    We're not done reviewing everything.   I will qualify with

25  that.   But based on the information we have at this point, the

1   information that I have in front of me, anyway, I should say,

2   we have one, two, three, four, five, six, seven, eight, nine,

3   ten, eleven co-conspirator statements, and based on my notes,

4   that's the bulk of our case against your client.

5   Q    Eleven?

6   A    Yes, ma'am.

7   Q    You've testified about three.  Who are the other -- who are

8   the other nine?

9   A    So, I don't -- I'll just list them off and so there may be

10  some that I've already mentioned.  Alisha Feeney.

11  Q    Well, let's stop right there.  What did Alisha say about

12  Mr. Bell?  And her last name is what?

13  A    Feeney.  F-E-E-N-E-Y.

14           MR. SMITH:  Your Honor, Ms. --

15           THE COURT:  Hold on.  Hold on.

16           MR. SMITH:  Ms. Romero will get discovery and have all

17  the reports available for if she's looking for every statement

18  made against her client.

19           THE COURT:  I understand.  I'm going to let you probe

20  some, but please let's not --

21           MS. ROMERO:  Okay.

22           THE COURT:  -- summarize all eleven.

23           MS. ROMERO:  No, no, Your Honor.

24           THE COURT:  We'll be here all day.

25           MS. ROMERO:  I understand.

1          THE COURT:  Okay.

2          MS. ROMERO:  I just, I just want to make sure that

3  there's no confusion between Mr. Troy Bell and the other Dustin

4  Bell --

5          THE COURT:  Oh.

6          MS. ROMERO:  -- that they were talking about, because

7  earlier I think he was kind of confusing the two, and I just

8  wasn't sure about that.

9          THE COURT:  Okay.  I'll let you clear that up.  If you

10  want to give the list of 11 and let Ms. Romero write them down,

11  and then you can ask some questions following up.

12          MS. ROMERO:  Thank you.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  It's also important for all defense

15  counsel to know, there -- I want to make sure we don't have

16  conflicts.  So you'll want to do a conflicts check.  There's a

17  lot of names here that we've been seeing over the last few

18  years.  And I know all of you have been involved.  We tried to

19  avoid that in making the appointments.  But as you get names,

20  if you will please be diligent on checking for conflicts.

21  Hopefully, we did a good job.

22      Go ahead and answer as to the 11 names, if you will.

23          THE WITNESS:  Yes, Your Honor.  So, the first name I

24  mentioned is Alisha Feeney.  The last name is F-E-E-N-E-Y.  And

25  I just realized the next name that I'm going to provide you is

1  listed twice, so it's actually only 10 names, not 11.  That

2  next name is Tiffany Bradberry.

3  BY MS. ROMERO:

4  Q    Okay.

5  A    The next name is Haldon Stikeleather.

6  Q    Okay.

7  A    The next name is Nicki Risovi.  The next name is Lauren

8  Moore, who I believe is mentioned in the complaint.  The next

9  name is Candace Whitten.

10  Q    Okay.

11  A    The next name is Leslie Payne.  She may be mentioned in the

12  complaint.  The next name is Chris Lee.  The next name is Mandy

13  Turner, and I believe she's mentioned in the complaint.  The

14  next name, the last name, is Lee Baker, who is mentioned in the

15  complaint.

16  Q    And these people that you've interviewed about Mr. Bell,

17  did you -- how did they recognize him?  I mean, did you show

18  them a picture or something of him, or how did -- how do you --

19  how did they identify him?

20  A    I don't have all those reports in front of me.  I can

21  review some.  And I don't recall off the top of my head.  I can

22  review what I have, if you'd like.

23  Q    One of them, you said -- I guess it was Mandy Turner --

24  that information she gave was from activity that may have

25  occurred in 2010; is that correct?

1  A   As I recall, but it's from memory, that it was older

2  information around that time period.  And my notes indicate

3  that Ms. Turner indicated that your client was a drug customer

4  of a gentleman by the name of Joe Wethington.

5  Q   And then Mr. -- I believe it's Mr. Baker, you talked about

6  him talking about Mr. Bell.

7  A   Yes.

8  Q   And you said it would have been more recent, his

9  information, where he supposedly observed Mr. Bell with some

10 quantities of methamphetamine.  Do you know that time frame?

11 A   I can only give you a rough estimate.  I don't have dates

12 in front of me.  I'm familiar with Mr. Baker's involvement with

13 the conspiracy as being primarily in 2015.

14 Q   But when he supposedly observed Mr. Bell, you don't know

15 when that was?

16 A   I don't have that information with me.

17 Q   And you don't know where that was?  I mean, was it in a

18 house, an apartment, in Tarrant County?  Do you know anything

19 about that?

20 A   I don't have that particular report, so unless it's listed

21 in the complaint I don't have that information handy.

22 Q   And what about these other 10 people that you listed?  Do

23 you know where -- what they saw or when they saw it or --

24 A   I have --

25 Q   -- where it happened?

 1   A    I believe I have the -- Lauren Moore, a Lauren Moore

 2   interview with me, a report, a Leslie Payne report, and I think

 3   an Alisha Feeney report.

 4   Q    And do you know when that happened?  Was it this year?

 5   Last year?  2010?  Or when?

 6   A    I can look.

 7        (Pause.)

 8   Q    I don't want to take up any of the Court's time, any more

 9   of the Court's time.  But to your recollection, you've never

10   seen a report that shows when any of these people might have

11   had any drug transactions with the person you're accusing here

12   today, Mr. Troy Bell?

13   A    I wouldn't say that I've never seen a report.  I'm just

14   saying that -- I would say that I don't recall at the moment.

15   Q    Okay.  What about any drugs?  Did you or any other agent

16   involved in this seemingly-extensive investigation ever seize

17   any drugs from Mr. Troy Bell?

18   A    Not to my knowledge.  No, ma'am.

19   Q    Did you seize any guns related to any drug transactions or

20   anything like that from Mr. Bell during this -- any time during

21   this investigation?

22   A    Not to my knowledge.  No, ma'am.

23   Q    What about any drug paraphernalia that would indicate in

24   some way at least that he was in fact distributing drugs

25   somehow?  Scales, baggies, notes, anything like that?

1  A    Not to my knowledge.  No, ma'am.

2  Q    What about any phone calls where he might have talked in

3  code like some of the other defendants you've talked about,

4  where he might have been talking about dealing drugs or buying

5  or selling or in any way involved in this drug -- these drug

6  transactions?

7  A    At this point, I'm not aware of any.  As I said, we have

8  not reviewed everything, but at this point I'm not aware of, in

9  the investigation --

10 Q    But at this point you have accused him, right?

11 A    Yes, ma'am.

12 Q    Okay.  But you are not aware of any phone calls?  Text

13 messages?

14 A    No, ma'am.

15 Q    Facebook postings?

16 A    Not yet.

17 Q    Pictures where he's holding drugs or money or anything like

18 that?

19 A    No, ma'am.

20 Q    When you arrested or when he was arrested, was there any

21 drugs, paraphernalia, pictures, guns, anything that would show

22 that he was in some way a drug trafficker?

23      (Pause.)

24 A    This is the same Texas DPS draft report that I reviewed

25 earlier relating to arrests on July the 21st.  There is no

1  mention of any drugs, any drug paraphernalia, any firearms.

2  Mr. Bell was arrested and a cell phone was seized.

3  Q   Okay.  What about surveillance?  Did you or any of the

4  other agents involved in this investigation ever follow or

5  observe or surveil any activity by Mr. Bell that would indicate

6  that he was involved in drug trafficking in any way?

7  A   I have not done any and I'm not aware of any.

8  Q   Okay.  What about any confidential informants that may have

9  been working for law enforcement in this investigation who may

10  have tried to -- bought drugs from Mr. Bell or tried to buy

11  drugs from Mr. Bell or talked to Mr. Bell about buying drugs or

12  selling drugs?

13  A   Not to my knowledge.  No, ma'am.

14  Q   No?  So I guess then what you're saying to the Court is you

15  have no drugs, you have no paraphernalia, you have no evidence

16  of any kind, any -- of that nature, and you have statements by

17  people who may have been some in 2010 of some activity, and

18  statements of people where you don't know when it occurred, you

19  don't know under the circumstances it occurred, you don't know

20  anything about how it occurred?  And that's pretty much what

21  you're saying to the Court, I guess, right?  Or do you have

22  more?

23  A   I wouldn't describe it that way.  There's the detail that's

24  in the complaint and there's also -- I would say that, with the

25  exception of Ms. Turner, the information that I'm familiar with

1  will primarily be in the 2014-2015, possibly into 2016 time

2  period.

3  Q    So possibly, but we don't know?

4  A    2014-2015 for sure, possibly into 2016.

5            MS. ROMERO:  No other questions, Your Honor.

6            THE COURT:  All right.  Mr. Crum, cross-examination?

7            MR. CRUM:  No questions, Your Honor.

8            THE COURT:  Mr. O'Shea, cross-examination?

9            MR. O'SHEA:  Yes, Your Honor, briefly.

10                     CROSS-EXAMINATION

11 BY MR. O'SHEA:

12 Q    Agent, on Paragraph 17 in the complaint, with respect to

13 Ms. Norris again, some of the questions that Ms. Romero asked,

14 there are no dates involved -- let me back up.  These are two

15 debriefings that are being referred to in Paragraph 17, right?

16 Two separate debriefings, one of Mr. Baker and one of Mr. --

17 A    Stepich.

18 Q    -- Stepich?

19 A    Yes, sir.  That's how I would characterize it.

20 Q    Okay.  And that's it?  Two debriefings, right?  That's what

21 I understand from reading that paragraph.

22 A    Yes, sir.

23 Q    Okay.  Were you there during the debriefings?  Either one?

24 A    I have sat in on a debriefing of Mr. Baker and I've sat in

25 on a debriefing of Mr. Stepich, but I can't remember if they

 1  were the particular debriefings when he talked about your

 2  client.

 3  Q   Okay.  Can you give dates on any of these transactions that

 4  are referred to in that paragraph?  Are there dates reflected

 5  in a report that are more specific as to when these

 6  transactions allegedly took place?

 7  A   (no immediate response)

 8  Q   I'm not asking for the dates.  I'm just asking if those

 9  dates exist.

10  A   I believe so.  And what I was going to reference was the

11  date of the interview that might put a time frame on it.  I

12  don't have those reports in front of me.

13  Q   Well, the description in Paragraph 17 is very general.

14  It's -- basically, someone could have said this thing in about

15  30 seconds, right?  But were the circumstances under each of

16  these transactions other -- and I'm not asking for discovery --

17  but are they described more fully anywhere else?

18  A   Without having those reports in front of me, I can't say.

19  Q   Okay.  Were they corroborated by anything else?

20  A   I think they were corroborated by several things, including

21  your client's Facebook account and the one-out seizure in

22  December of 2015.

23  Q   So you're saying that these transactions are the same

24  transactions you're talking about in the Facebook account?

25  A   Oh, not necessarily.  Just that she's involved in

 1  methamphetamine distribution.

 2  Q    Okay.  Well, I'm asking if these transactions were

 3  corroborated, if these specific transactions were corroborated

 4  in Paragraph 17 with anything from a text, a surveillance, a

 5  video, anything of a physical nature.

 6  A    I have not reviewed -- I just was able to download her

 7  account last night, so I have not reviewed the full account, so

 8  I can't answer that.

 9  Q    Okay.  With respect to the Facebook account, under what

10  name is that account?

11  A    Angel Renee.

12  Q    Angel Renee?

13  A    Angel Renee.

14  Q    Did -- were you able to verify that that Facebook account

15  was Ms. Norris sitting here today?

16  A    Yes.  There are several photos of her on the account, and I

17  believe she also provides her date of birth on the account.

18  Q    Okay.  So you were able to verify that that was her

19  account?

20  A    Yes, sir.

21  Q    Now, the discussions in there, your interpretations are

22  that they were drug deals they were talking about?

23  A    Yes, sir.  Well, some of the -- not all the conversations

24  in the account were drug transactions, were related to drug

25  transactions.  But there were certainly drug-related

 1  conversations in the messenger portion of the account.

 2  Q    Were you -- she was in prison, she was released in roughly

 3  end of March 2016, where she got 40 months' deferred probation,

 4  right, for a drug -- for a possession with intent to deliver,

 5  right?  That's the report you -- that I was handed.

 6  A    The Pretrial report?

 7  Q    No, no.  The report dealing with her arrest.

 8  A    The arrest in December of '15 --

 9  Q    Yes, sir.

10  A    -- for the one ounce?  I don't know the outcome of that.

11  Q    She was given -- okay.  Well, let me -- let me just tell

12  you, she was given 40 months, 48 months' probation in March.

13  And my question is, were you able to verify whether or not she

14  was in jail during that time that you mentioned, any of these

15  dates of her Facebook account discussions?  In other words,

16  were the discussions going on while she was in jail?

17  A    I have not done that comparison yet.

18  Q    Because there was one -- at least one month that you

19  mentioned, March, where she was in jail.

20  A    March of which year?

21  Q    2016.

22  A    Do you recall which message that was?

23  Q    I don't.  But have you -- have you cross -- my question

24  generally is have you cross-checked all of these messages to

25  make sure she was actually out of jail when they took place?

1    A    Oh, no, sir.  The return we received from Facebook is well

2    over 4,000 pages.  I've just started.

3    Q    Okay.  All right.  And so you're not aware that she's been

4    on probation since March of 2016, I guess a year and a half,

5    and she's tested clean every time, she's never missed a report,

6    she's had no violations whatsoever in her probation?

7    A    I'm not aware of that.  I am aware that another individual

8    was arrested at the same location where she was located on the

9    day of the takedown who also had a felony drug warrant.

10   Q    Let me ask you about --

11   A    I don't know if that would be a violation of her probation

12   or not, but --

13   Q    Well, you don't know whether or not it's a violation of

14   probation --

15   A    No, that's what I said.

16   Q    -- because you don't know whether -- these transactions

17   you're referring to or what time frame they took or -- you just

18   don't know that, right?

19   A    No, I'm sorry, maybe I misspoke.  The day that your client

20   was arrested, the location where she was found, there was

21   another individual there who also had a felony warrant for

22   possession of a controlled substance.  My point was --

23   Q    Was that her boyfriend?

24   A    I have the name.  I don't know if it's the boyfriend.

25   Q    That's fine.  Let me just ask -- let me ask you about that

1  day she was arrested.  She was in her apartment, right?

2  A   I believe she was at a residence.  Here we go.  She was

3  arrested at, according -- again, I believe this is a draft

4  report from the Drug Enforcement Administration -- she was

5  arrested at 8921 South Normandale in Fort Worth, and the

6  apartment number is 1118.

7  Q   Okay.  And when she was arrested there, that was her place

8  of residence?

9  A   I don't know, sir.

10 Q   Well, did the report indicate whether -- I mean, she had

11 her baby, her one-month-old baby there, right?  I mean, her

12 one-year-old baby?  And her belongings.  Does it indicate --

13 okay.  And she gave consent to search?  There was a consent to

14 search that apartment, and no drug paraphernalia was found, no

15 drug-related instruments, any scales, any drugs, any baggies?

16 Anything in that report that indicates that she -- there's

17 drug-related activity going on in that apartment?

18 A   Just the other individual with the felony warrant.  Nothing

19 beyond that that I'm aware of.

20 Q   Nothing beyond that?

21 A   The report doesn't indicate anything beyond the other

22 individual with the felony drug warrant.

23          MR. O'SHEA:  I'll pass the witness, Your Honor.

24          THE COURT:  Before we move from Ms. Norris.

25                    EXAMINATION BY THE COURT

1          THE COURT:  So the information given by Lee Baker and

2    Michael Stepich as to Ms. Norris, what was the year time frame?

3    Was that '14-'15 or '16?  Do you recall?

4          THE WITNESS:  No, sir, I don't.  I can't say with a

5    good degree of certainty.

6          THE COURT:  Is there any indication to me it's recent?

7          THE WITNESS:  I have the Facebook messages that

8    indicate drug transactions as recently as October of '16.

9    That's the most recent one I've found so found.

10         THE COURT:  The conversations --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- that we talked about or heard about

13   earlier?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Okay.  All right.  Any further questions

16   for your witness?

17         MR. SMITH:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. SMITH:

20   Q   Okay.  Starting with Ms. Norris -- and I want to backtrack

21   onto the custodial situation of these individuals, you know,

22   kind of more broadly again.  Is it common for people to go to

23   jail for a day or two and then come out and then continuing

24   their drug trafficking both before and after their brief period

25   of incarceration?  Would that be a common thing?

1  A    In this investigation, it's very common.

2  Q    Okay.  So it's very possible that somebody could have gone

3  into jail for two to three days, maybe even a week or two, in a

4  certain month, but that doesn't necessarily mean that they have

5  stopped drug trafficking?

6  A    No, sir.  Not in my experience.

7  Q    Okay.  All right.  Now, on to Ms. Norris, Angel Renee

8  Norris.  I know you itemized to some extent the information for

9  Mr. Bell.  Can you do that same thing as it relates to Ms.

10  Norris?  Who else gave information besides Mr. Stepich and Mr.

11  Baker as it relates to Mr. Bell?

12  A    Yes, sir.

13  Q    Or to Ms. Norris, sorry.

14  A    I will, before I start, I will mention that the notes that

15  I have in front of me do not include any of the Facebook

16  information.

17  Q    All right.

18  A    We didn't have that at the time that these notes were

19  created.  So, but to answer your question, we have -- it

20  appears we have at least 12 statements.  Additionally, we have

21  the arrest that I described earlier in December '15 when the

22  one ounce was seized from her.  And we have some text messages

23  that were recovered from the cell phone of Travis Cathey, who

24  was a co-conspirator who I believe was convicted in a related

25  case in 2015.

McCurdy - Redirect                    63

1  Q    Okay.  So can you name those individuals for Ms. Norris?

2  A    Yes, sir.  Alisha Feeney.  Michael Stepich.  Nicki Risovi.

3  Jonathan Ruckman.  Lauren Moore.  Leslie Payne.  Billy

4  Leverett.  Megan Kemp.  Mandy Turner.  Lee Baker.  Brian Brown.

5  And Tiffany Bradberry.

6  Q    Okay.  And those, those are some of the same people that

7  you named off in Mr. Bell's case, too; is that right?

8  A    Yes, sir.  Some of the people overlap.  I will add that

9  even though -- just getting starting in the Facebook

10 information, I was at least, out of this list, I was able to

11 find some drug-related messages between Alisha Feeney and Ms.

12 Norris.

13 Q    Okay.  And approximately when did that occur?  Do you know?

14 A    Ms. Feeney was arrested on this case in June of 2015, so it

15 would have been before that.

16 Q    Okay.  And so that's when you're saying, as it relates to

17 both Mr. Bell and Ms. Norris, the bulk of that information

18 comes from 2014 and 2015 from cooperators who were dealing in

19 drugs during that time period?

20 A    Yes, sir.  I would say that's accurate.

21 Q    Okay.  So you can't say that on a -- necessarily say that

22 on a specific day in 2015 that this person did this event, but,

23 more broadly, that this sort of conduct occurred over that time

24 period.  Is that a fair statement?

25 A    Yes, sir.  That's correct.

1  Q   All right.  And that would be true for both Mr. Bell and

2  Ms. Norris?

3  A   Certainly, Mr. Bell.  I mean, I do think, related to the

4  Facebook information I've testified to already, that that helps

5  us nail down some dates.  But in general, that's correct.

6  Q   Okay.  And now Ms. Mandy Turner, who provided information

7  as relates to Mr. Bell, the thing that she talked about in

8  reference to 2010-2011 time -- approximately that time period,

9  coincides with Mr. Bell's 2010 arrest.  Is that accurate?

10 A   It would --

11 Q   On drugs?

12 A   It would, based on the information I reviewed, it would

13 seem to be roughly the same time period.

14 Q   Okay.  All right.

15         MR. SMITH:  No further questions, Your Honor.

16         THE COURT:  All right.  Any follow-up questions based

17 upon those questions?  I'm going to keep it within the scope.

18 From the Defense?  If there is, please let me know.  (No

19 response.)  Very good.  You may step down, sir.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.

22    (The witness steps down.)

23         THE COURT:  You may call your next witness.

24         MR. SMITH:  Nothing further, Your Honor.

25         THE COURT:  All right.  So, we'll begin with the

1   Defense.  I will tell counsel, if any of you need to excuse

2   yourself to the restroom or anything like that while another

3   counsel is asking questions, feel free to come and go from the

4   courtroom.  But I want to keep going.  We've got another

5   hearing at 2:00 and we're going to just go straight.

6       So, Mr. Davis, do you wish to present any evidence on the

7   issues of probable cause or detention as to your client?

8           MR. DAVIS:  Your Honor, I was going to.  He may not

9   necessarily have to be here.  My client's boyfriend, Jason

10  Voss, unfortunately is an independent contractor in the carpet

11  business.  Was present in the courtroom but finally had to

12  return to a job that he's got going.

13          THE COURT:  Oh.

14          MR. DAVIS:  The only thing he would add to what's in

15  Paragraph 3 of Page 2 of my client's report is that he has

16  confirmed with her employer that if she is released she would

17  be able to go back to work for them, as she has been.  And

18  that's the employment in that next section.

19          THE COURT:  Make ready?

20          MR. DAVIS:  So, if it's acceptable to the Government

21  and the Court, I would offer that as a proffer, or certainly I

22  can get him back or something in writing.  But that -- he was

23  going to confirm the other information that was already in the

24  report.  That was going to be the only thing that he would add

25  --

1          THE COURT:  All right.

2          MR. DAVIS:  -- there.  So that would be all I would

3  have there, Your Honor.

4          THE COURT:  I will accept that proffer from that

5  Defense.

6      Mr. Green, do you wish to offer any evidence on the issues

7  of probable cause or detention as to your client?

8          MR. GREEN:  Yes, Your Honor.  By means of a proffer

9  that, as is stated in the Probation Office report here, my

10 client's gainfully employed.  He has four years of residence in

11 Granbury.  He would also like to proffer -- I mean, dispute one

12 thing that says he used prescription opiates two months ago.

13 He says he didn't say that.  And also that he did have recent

14 criminal trouble in Harris County.  He came to court on that

15 case.  He was facing a minimum of 25 years, a maximum of 99

16 years or life.  And he came to court every day, and that case

17 was dropped to a misdemeanor assault.

18         THE COURT:  All right.

19         MR. GREEN:  Thank you, Your Honor.

20         THE COURT:  I will accept that proffer from the

21 Defense.

22     Mr. St. John, do you wish to offer any evidence on the

23 issues of probable cause or detention?

24         MR. ST. JOHN:  I have no issue specifically as to

25 probable cause, Judge.  I will suggest to the Court and make a

1  proffer through his fiancée, Ms. Powell, who is in the

2  courtroom -- if she could stand -- that she would indicate --

3  she'd testify everything in the report is true and accurate.

4  My client is employed, with one job for seven years, another

5  for ten years.  He lives in the North Texas area, has all his

6  life.  Can live with his mother -- I guess his mother-in-law-

7  to-be, and that's confirmed through the Pretrial Release.  And

8  I ask the Court to refer to the last page where the Pretrial

9  Release is recommending my client be released on conditions of

10  release.

11          THE COURT:  All right.  I'll accept the proffer on

12  behalf of Mr. Penneston.

13      Ms. Romero, do you wish to be heard in summation as to your

14  client, Mr. Bell?

15          MS. ROMERO:  Yes. I have a brief proffer and a

16  summation.  Mr. Bell is employed, or was employed before he was

17  arrested, at Trailer World.  And then, before that, for a year

18  and a half at another similar type or Lone Star Fuel Injection.

19  And he could go back to his job as well.  He has been a

20  resident of the area, particularly Hood County, Hood and

21  Tarrant County.  He has seven brothers, seven brothers.  And

22  one of them is not Dustin.  He doesn't have a brother named

23  Dustin.  Seven brothers and three sisters in the area.  He

24  could live with his sister.

25          One other thing, Your Honor.  The last time he was

1  convicted on that 2010 charge, he was -- Judge Gallagher gave

2  him 60 days to report to prison so he could put his affairs in

3  order, and he showed up and everything was fine and he hasn't

4  -- I mean, the last time that he had any sort of indication

5  where he failed to identify was a number of years ago, but

6  nothing at all recently.  So we would proffer that.

7      And we would just basically say, as the Court heard, the

8  evidence is, you know, some statements about sometime in '14,

9  '15 or '16, no month, no circumstances, we don't have anything.

10 There's no drugs.  There's no conversation.  There's not a

11 single text.  There's not a photograph.  There's just nothing

12 there that I can see, unless I missed it.

13     So we would argue that clearly the Government has a right

14 to go and get an indictment, and they may do that and there may

15 be other evidence out there and this agent just didn't know it,

16 I don't know, but as far as his release, based -- he has an

17 extensive criminal history, granted.  It was a long time ago,

18 much of it.  He has appeared.  He was given 60 days to appear

19 on the last one, and he did.  He has a job.  He has a place to

20 live.  He's never lived anywhere else but in this area.  And he

21 has extensive contacts.  And that's what we would say.

22         THE COURT:  Thank you, Ms. Romero.  I'll accept that

23 proffer.

24     Mr. Crum, do you wish to present any evidence on the issues

25 of probable cause or detention as to Ms. Glenn?

1          MR. CRUM:  Regarding detention, I do have a proffer

2     I'd like to offer to the Court.  She does have family members

3     that are present.  Specifically, her great-aunt, Jerry Kilgore;

4     her mother, Doris Russ; and then two brothers.  They all live

5     in Parker County.  I think -- and I was anticipating calling my

6     client's mother or great-aunt.  But just as a proffer, I

7     believe they would testify that my client can reside with them

8     in their home.  Her mother is disabled and can provide 24-hour

9     adult supervision for my client.  The aunt doesn't have any

10    criminal history, has a stable job, stable employment.  Can

11    provide transportation, supervision as well, and can provide or

12    ensure that my client can be in court when notified to be here.

13    They would also testify that my client is enrolled in

14    Weatherford College.  Will be attending classes this fall.

15        And I have some argument I would make if this is the time

16    to do it, or I'll --

17          THE COURT:  No, just proffering the facts.

18          MR. CRUM:  Then that's what the extent of the proffer

19    would be, Your Honor.

20          THE COURT:  I will accept that proffer from the

21    Defense.

22        And then, finally, Mr. O'Shea, do you wish to present

23    evidence on this issue?

24          MR. O'SHEA:  Yes, Your Honor.  I would like to make a

25    proffer on behalf of Ms. Norris.  I spoke with Deborah

1   Espinosa, who's referenced in the Pretrial report.  She -- Ms.

2   Norris and Ms. Espinosa were actually living together for about

3   a year and a half, up until last month.  Ms. Espinosa said she

4   would allow Angel Norris to live there with her, knowing that

5   she's been on probation for almost a year and a half from the

6   charge that was referenced by the agent.  Clean.  Reported

7   every time.  No problems whatsoever.

8        Ms. Espinosa doesn't have any problems.  Ms. Espinosa

9   actually has her one-year-old child and her one-month-old child

10  in her possession that CPS gave her, and so she more than

11  welcomes Ms. Norris back into the home.

12       Ms. Norris understands that she's got to report and she's

13  got a bear of a case in front of her, but she wants to get out

14  to at least be able to take care of this one-year-old and the

15  one-month-old.  She's -- and by all indications, for the last

16  year and a half, she has toed the line on a 48-month deferred

17  probation for that case that was mentioned.

18       So Ms. Espinosa has been gainfully employed with Fort Worth

19  Transportation Services.  She couldn't be here today.  Friday

20  is her day off.  She has owned a cleaning business in the past.

21  Always has been employed.  She has three children of her own.

22  Two own their own businesses.  She's always lived in the

23  Tarrant County area, as has Ms. Norris.  And Ms. Espinosa has

24  eight grandchildren, so nobody's going anywhere.

25       And so we'd ask, on the issue of detention, that Ms. Norris

1   be released.  The Pretrial Service indicated it had one issue,

2   and that was the stability of her residence.  And I think that

3   I've addressed that with my proffer, Your Honor.  And if the

4   Court needs anything further, we'd be welcome to offer that to

5   the Court.

6          THE COURT:  Okay.  Thank you.  All right.  Does the

7   Government have any evidence it wishes to offer in rebuttal at

8   this time?

9          MR. SMITH:  No, Your Honor.

10          THE COURT:  Then I'll consider the evidence closed.

11   Do you wish to be heard in summation?

12          MR. SMITH:  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. SMITH:  I'll start with 582, Heather Dean and

15   Jason Easley.  I think that the evidence was -- and Mr.

16   Penneston -- at least for probable cause was overwhelming.  I'm

17   not really going to address that too much.  I think some issues

18   that the Court may be interested in is the no-bill issue of

19   January 2017 for Ms. Dean.  Obviously, weird things happen at

20   Tarrant County, but the Government put on the evidence of that

21   arrest.

22       I think it's pretty clear what was going on.  She was

23   passed out at a Wal-Mart and somebody called, the store manager

24   called 911 or the police, the police showed up, found some drug

25   paraphernalia and residue in a bong, I believe, that sort of

1  thing.  There's -- so it's pretty shocking that that sort of

2  thing was no-billed.

3      But in any event, there was constant communication between

4  Dean, Heather Dean and Jason Easley on Facebook Messenger.  In

5  addition to the current drug trafficking, all the way up 'til

6  May, I believe, at least, from Ms. Dean.  Mr. Easley, I won't

7  belabor the point too much, but he has an off-the-charts

8  criminal history.  It's pretty substantial.  Pretty amazing,

9  actually.  And he's flaunting the representation of having

10  assault weapons in that status.

11      Mr. Penneston confessed and confirmed information that we

12  had on him already, though he minimized it to some extent.  He,

13  too, has multiple felony convictions.

14      Now, as it relates to the other complaint, Your Honor, 589,

15  Mr. Bell and Ms. Norris appear to present similar-type

16  arguments, though I think more so Mr. Bell, in that, you know,

17  these co-conspirators or co-defendants can't be believed.

18  Actually, she didn't even really challenge the believability of

19  it, just that there's no specific time frames.  Well, of

20  course, the nature of this drug conspiracy is abundantly clear.

21  By way of example, though no text messages or Facebook or the

22  like was taken in regards to Mr. Bell, numerous co-conspirators

23  identified him as trafficking.  Mandy Turner identified him

24  historically from 2010-ish, 2011, which is confirmed by his

25  arrest and subsequent guilty plea on that issue.  The fact that

1 he pled to less than one gram is not necessarily indicative of

2 the quantity involved, but also probably more indicative of

3 what Tarrant County may do in their pleading decisions at the

4 state level.

5     In any event, multiple other people -- I think nine after

6 that -- put him right in the middle of it in 2014 and '15,

7 which is what is alleged to have happened.

8     Now, on to Ms. Glenn.  I won't belabor that point, just the

9 one issue on the proffer.  I believe it was her police report

10 in April 2015 where she indicated that she got her backpack

11 from her mother.  And that was the -- what was the drugs and

12 the -- or the bong and the syringes, I believe, were found in

13 there.  I may be mistaken, but it was -- that was at least the

14 general -- the gist of that testimony, that information.

15     Now, finally, as it relates to Ms. Norris, obviously, the

16 Government is sympathetic to the Defendant's case and the fact

17 that she does have children, young children.  Unfortunately,

18 that has not deterred Ms. Norris from drug-trafficking

19 extensively and repeatedly.  Even one, as the agent testified

20 about, in October of 2016, which obviously would have to

21 represent the one-year-old as opposed to the one-month-old, but

22 that she was -- had her child with her during her preparation

23 or the consummation of a drug deal, which that would mitigate

24 -- you know, at one point it's mitigating, the fact that she

25 has children; it's quite sad and depressing that she's doing

1  this sort of thing while she's caring for her children.

2     In addition, on Ms. Norris' case, although she did receive

3  deferred probation from the County, it's clear that during that

4  deferral or probated sentence, during both before the

5  adjudication of that and after, she's been -- actually, at

6  least contemporaneous with that, she's been involved in

7  trafficking to some extent, even while she's on that deferred

8  state or probated state, if my memory's correct.

9     But in any event, the Government urges detention on all

10  defendants for the reasons stated.

11        THE COURT:  That last statement you made regarding Ms.

12  Norris, she went on the four-year probation back in March of

13  '16, and so you're referring to the evidence of Facebook

14  messages and things like that in the intervening time?

15        MR. SMITH:  Yes.  Yes, Your Honor.  And I believe that

16  the last one we had on Ms. Norris was October of 2016, if

17  that's -- if my memory is correct on that testimony.

18        THE COURT:  Okay.  I understand.

19        MR. SMITH:  October 2016.

20        THE COURT:  Thank you.  That's a lot to keep straight

21  on.

22     All right.  Let me start with the Defense.  And I'll ask

23  each of you, do you wish to make a summation?  Mr. Davis?

24        MR. DAVIS:  Yes, please, Your Honor.

25        THE COURT:  Okay.  Go ahead.

1           MR. DAVIS:  Your Honor, with respect to probable

2  cause, the complaint devotes a lot of attention to what was

3  going on a couple of years ago with Ms. Feeney and those

4  related folks.  As the Court well knows, and Mr. McCurdy told

5  us, those have all -- they've been prosecuted and they're long

6  gone to federal prison, and that was a couple of years ago.

7       What we heard about now that pertains to the allegations in

8  this complaint has to do apparently with my client's attempting

9  to purchase GHB a couple of times from one of the co-

10  conspirators here, and that's about all we've got with respect

11  to the folks who are named here in this complaint for this

12  conspiracy.  And it's not clear that they actually ever did a

13  deal here.  It's not clear, on some of it, what the quantity

14  is, although I think there's one suggestion that it might be a

15  half-ounce quantity.

16      And there's even part of the complaint that would debunk

17  the notion that they had an agreement or some kind of

18  arrangement.  On the very last part of Paragraph 15 on Page 8

19  is Mr. Easley asking my client, "What you going to pay?"  Well,

20  you know, that would suggest negotiating a freestanding

21  transaction, and I think the Fifth Circuit case law is clear

22  that one or two transactions does not a conspiracy make.

23      So, you know, we've got evidence of something from a couple

24  of years ago that's never been tied in to what happens now.

25  What happens now appears to be an attempt at a couple of

1    transactions that's not connected beyond anything other than

2    one person in the conspiracy.  So I'm not sure it's a

3    conspiracy at all.  So, obviously, we think that there's a

4    probable cause issue with what the Government has pleaded here.

5        With respect to detention, the Court can see my client does

6    have some criminal history.  It is significant, some of it, but

7    it's all several years old.  Her last conviction I believe was

8    in 2014 on a felony DWI that was 1244A'd down to 120 days.  She

9    has been working.  She has a place to go, a place to live.  She

10   can go back to her job.  And getting on pretrial release would

11   allow her to start getting some monitoring, testing and

12   counseling for a drug problem.  So, you know, we think the

13   Court can release her, and that given the situation, that we

14   barely clear that hurdle on the rebuttable presumption, we

15   would ask the Court to find that and allow her out on

16   appropriate conditions.

17            THE COURT:  All right.  Thank you, Mr. Davis.  Mr.

18   Green?

19            MR. GREEN:  Thank you, Your Honor.  As part of the

20   probable cause, I have a similar argument, that negotiation is

21   not the same as participation.  Here, the evidence is scant to

22   show probable cause that Mr. Easley actually participated in a

23   drug distribution conspiracy.  There are some text messages,

24   and it's not clear it's even about drugs.  That's a speculation

25   on the agent's part, and I'd like the Court to weigh that bit

1   of evidence.

2        And the offense charged here is distribution, so I think

3   the evidence has to point solely to that.  I think the evidence

4   is very scant, that there's no corroboration that Mr. Easley

5   had a gun or guns or assault rifles, as alleged.  There is no

6   evidence, as the agent said, of him being in possession of

7   methamphetamine or another narcotic.  They didn't catch him

8   with it.  Or the money.

9        I'd also like the Court to take in possible credibility

10  issues of some of our co-conspirators, such as Mr. Maldonado.

11  You have a convicted felon, you know, trying to give a

12  statement to benefit his own self.  So we would argue that

13  probable cause is lacking here as far as Mr. Easley is

14  concerned.

15       As far as detention, Your Honor, as we had argued before,

16  Mr. Easley has a good job.  He's been employed there at Grady

17  Rentals for four years.  He's been living in Hood County that

18  whole time.  He has family in the area.  He has a stable home.

19  He had a hard felony, habitual felony enhanced case in Harris

20  County in the 176th District Court, and Mr. Easley made it to

21  every court appearance.  They ended up reducing that habitual

22  felony charge of aggravated assault to a misdemeanor assault,

23  which maybe shows something about the case.  So there's no

24  violation or violence pled in this Code [sic], either.

25       Mr. Easley is -- when he got off parole last -- in 2011?

1          DEFENDANT EASLEY:  Yes, sir.

2          MR. GREEN:  And he went off and got him a degree and

3     this good job.  So we'd ask that you would let him do drug

4     treatment or release him on conditions of release.  Thank you,

5     Your Honor.

6          THE COURT:  All right.  Thank you, Mr. Green.  Mr. St.

7     John, do you wish to be heard in summation?

8          MR. ST. JOHN:  Briefly, again, as to the issue of

9     detention, Judge, I would suggest to the Court that my client

10    is not a flight risk, nor is he a threat to the community.  The

11    report is very detailed in terms of what he's done in the past,

12    what his obligations are, where he will live, who he can live

13    with.  I'm going to simply ask the Court to take into

14    reconsideration the last page and recommendation made by the

15    Pretrial Services officer, who I would suggest is an expert in

16    regarding -- evaluating someone's position to be released on

17    conditions of release.

18         THE COURT:  All right.  Thank you, Mr. St. John.  Ms.

19    Romero, do you wish to be heard?

20         MS. ROMERO:  Again, briefly, on detention, Your Honor.

21    I believe that there is no evidence that Mr. Bell is a flight

22    risk or a danger to the community.  He has a place to live.  He

23    has a job.  He's always lived in this area.

24         And I do think that there is an issue with probable cause

25    in that there is absolutely no evidence to corroborate any of

1   the statements that any of the co-conspirators or informants

2   may have said about Mr. Bell.  In addition to that, there's no

3   time frame, there's no circumstances, there's no even detail as

4   to any of these supposed transactions.  So we would say there's

5   a serious problem on probable cause, again, as to Mr. Bell.

6            THE COURT:  Okay.  Thank you, Ms. Romero.  Mr. Crum,

7   do you wish to be heard?

8            MR. CRUM:  Yes.  Thank you, Your Honor.  Regarding

9   detention, I would just ask the Court to follow the

10  recommendations of Pretrial Services, which does recommend

11  release.

12      Ms. Glenn was born in Fort Worth.  Her entire family lives

13  in this area.  Her immediate family and all her close family

14  ties live in Parker County.  I would just ask that she be

15  allowed to live with her family.  If the Court finds it

16  necessary to limit that to the home of her aunt, great-aunt,

17  who is here.

18      From the testimony you've heard, it's clear that any

19  involvement that Ms. Glenn may have had in this conspiracy as

20  alleged was limited to 2015.  There has been no recent history

21  of major criminal activity.  She has one prior felony

22  conviction for theft.  That case has been disposed of.  The

23  arrest in 2015 for the possession of controlled substance, as

24  testified, the amount was very minimal, 0.2 grams.  There was

25  no other evidence that you would typically find with someone

1  who's a heavy dealer in narcotics.  There weren't any drug

2  notes, any scales, any baggies, anything to that effect.  Just

3  a minimal amount and some drug paraphernalia.

4      As the Court is well aware, people who are involved in

5  drugs do make false statements and say stupid things.  I bring

6  the Court's attention that any statement she may have made

7  regarding her mother was that, a stupid statement to try to

8  deflect responsibility from that backpack before it was

9  searched.  But as the Court is also aware of, that case was not

10  prosecuted and was dismissed.  And so she has one prior felony

11  conviction from 2015.  Strong family ties in the community.  I

12  don't believe that she's a flight risk at all.

13      There is some mental health history that's been made as a

14  -- as some concern, but it's ADHD.  I think that that's a

15  common diagnosis.  It certainly doesn't reflect that she's a

16  danger in any way because of that.

17      I would just ask the Court follow the recommendation of

18  Pretrial Services.

19          THE COURT:  Thank you, Mr. Crum.  Mr. O'Shea?

20          MR. O'SHEA:  Yes, Your Honor.  I'd like to start with

21  her probation that she's on.  My client refreshed my memory

22  that she -- that -- that was not -- the deferred probation was

23  -- it still is.  It wasn't reduced.  It was an enhanced felony.

24  So her range of punishment if she violates that is 15 to 99 or

25  life.  And so she has taken that seriously.

1    She -- with respect to these Facebook -- mentioning in

2   these Facebook, this is -- I haven't seen it, but this is

3   speculative.  It's nebulous.  One of them was about purses that

4   he speculated was about a drug transaction.  She has had her

5   children the entire time.  I mentioned CPS.  Again, she -- she

6   about hit me when I said that.  The CPS has not taken away her

7   kids or gotten involved.  Ms. Espinosa has the children right

8   now, but my --

9          THE COURT:  Because of this arrest?

10         MR. O'SHEA:  Yes.

11         THE COURT:  Yes.

12         MR. O'SHEA:  But my client has had these children ever

13   since she's been out.  That's been her full-time job.  She's

14   done some work with Ms. Espinosa, cleaning houses to gain some

15   income.  But since she's been out, she's been reporting.

16    And another thing.  The MHMR mentioning that she's had a

17   lifelong almost problem being bipolar, she actually has a --

18   through her probation, she has an appointment that is set up.

19   She's been off her medications while she's had her children and

20   has still had no problems.  But she has an appointment to go

21   back and be evaluated again and get through that process.  So

22   the State has taken care of all of these issues, and the only

23   issue that was left hanging was her residency, which we believe

24   we've addressed.

25    Thank you.

1          THE COURT:  Okay.  Thank you, Mr. O'Shea.  Any final
2    word from the Government?
3          MR. SMITH:  Briefly, Your Honor.  I don't want the
4    Court to confuse probable cause from the complaint with some
5    detention issues.  So the agent testified early on as to the
6    facts in the complaint about each defendant, and then in some
7    instances -- for example, for Ms. Dean and Mr. Easley -- the
8    agent testified about things that were past, that were beyond
9    the complaint, that were more recent, if you will, to show
10   several things, detention type issues and continuing contact
11   type issues.
12       So there's definitely a difference between the conspiracy
13   as alleged and proof and the one that's still going on as
14   people get arrested and go in and out jail.  The conspiracy
15   doesn't die when a person gets arrested or goes to jail
16   oftentimes because they're in and out of jail constantly.
17   That's another point that came up during testimony, and that's
18   very common amongst this -- or, between and amongst these co-
19   conspirators.
20       Now, and I think the key issue, too, and I don't want to
21   upset the proffer balance.  The Government understands the
22   efficacy of accepting proffers from defense attorneys on that,
23   besides wasting -- not wasting, but enduring three more hours
24   of time on testimony.  But again, I think the issue is -- and
25   even if we accept, if we accept all these things as true that

1   have been proffered, does that overcome the presumption that's

2   attached to these cases, especially given, especially given the

3   voluminous criminal history of I think every defendant here.

4   I mean, some are worse than others, but it's shocking, in some

5   of these cases, the criminal history and the blatant

6   violations.

7        And again, Ms. Norris may be the most difficult case for

8   the Court to consider, but -- and that's why the Government

9   elicited testimony about that arrest that she got the probation

10  for.  She had an ounce or so in her underwear, five or six --

11  four or five baggies in a backpack with scales and this sort of

12  thing.  And that's what she got probation for.  Which, again,

13  what Tarrant County does with certain cases is shocking.  And

14  maybe they took into account her difficult familial scenario,

15  or maybe some MHMR stuff.  But when does the buck stop with

16  her?  And that's why also the Government elicited testimony

17  about continuing conduct through Facebook and the like.

18       And so, again, the Government would ask for detention in

19  all cases.

20            THE COURT:  All right.  Thank you.  All right.  Based

21  upon the presentations -- and I thank all of you for your

22  patience but also your presentations and your arguments -- I

23  find that the low threshold, the relatively low threshold of

24  probable cause has been met in each case.  So I make a finding

25  as to probable cause against all defendants that are before the

1 │ Court in these two complaints.

2 │     The issue of detention is a little more complex, so I'm

3 │ going to basically address it a little more individually.  From

4 │ the start, based upon the extensive criminal histories of these

5 │ individuals, as well as the other evidence I've heard, I find

6 │ that Ms. Dean, Mr. Easley, and Mr. Bell all do present risk of

7 │ flight or nonappearance and a danger to the community unless

8 │ detained.

9 │     It is a rebuttable presumption case.  I hold that the

10 │ proffered evidence meets the Defense burden to produce some

11 │ evidence and shift the burden back to the Government, or at

12 │ least take away the rebuttable inference.  And ultimately, the

13 │ burden of persuasion never leaves the Government, and it has

14 │ been met in those three cases.

15 │     So, Ms. Dean, Mr. Easley, and Mr. Bell I will remand to the

16 │ custody of the United States Marshal while their cases are

17 │ pending.

18 │     As to Mr. Penneston, I'm taking into account relatively

19 │ less criminal history.  He's 31 years old, has a four-month-old

20 │ child at home, and the other information in the Pretrial

21 │ Services report, and the recommendation will be accepted by the

22 │ Court.  And I'm going to allow Mr. Penneston to be released on

23 │ conditions that we're going to go over in just a moment.  So

24 │ Mr. St. John, I'm going to need you to hang around for a few

25 │ more moments.

1       As to Ms. Glenn, 21 years old, relatively low criminal
2  history, and supportive family in the courtroom.  I have
3  concerns about how wheels-off your life has been the last
4  couple of years, but I'm going to allow you to remain out on
5  conditions of release while the case is pending.  I'm going to
6  leave it to my Pretrial Services officers to make the proper
7  housing determination, proper residence.  It may be your great-
8  aunt.  It may be your mother.  I'm not sure at this point.  But
9  I'm going to have a condition that you live where Pretrial
10 Services approves.  And we're going to keep close tabs on you
11 and Mr. Penneston as we go forward.
12      Ms. Norris is the more difficult issue when it comes to
13 detention.  Her criminal history is outrageous.  Two young
14 children are mitigating, but at the same time the dangers that
15 are presented and concerns to the Government, I do agree with.
16 I don't know this current situation, I don't know enough about
17 the current situation with Ms. Norris and this Ms. Espinosa and
18 the rest of Ms. Norris' family, I think, to make a final
19 determination today.  I'm going to take under advisement Ms.
20 Norris, and actually it'll be a conditional order of release,
21 for my Pretrial Services officers to conduct more of a home
22 investigation and make sure that there's a good, stable place.
23      I'm very concerned about these Facebook communications.
24 And I'm not even sure at this point -- I'm taking the whole
25 thing under advisement.  I'm not sure at this point that even

1  with a stable home, relatively stable home report, that I'm

2  going to grant conditions.  But as to Ms. Norris, I'm going to

3  take it under advisement.  And once I have more consultation

4  with Pretrial Services, I will issue an order and bring her

5  back and make a final ruling.  And we'll do that expeditiously.

6  We're not going to waste a lot of time.  Hopefully, I might

7  even be able to accomplish this by tomorrow.

8       So that's the order of the Court.  As it stands at this

9  point, I'm going to remand to the custody of the Marshal Ms.

10  Dean, Mr. Easley, Mr. Bell, and Ms. Norris, based upon the

11  Court's rulings as to those individuals.  And I'm going to ask

12  Mr. Penneston and Mr. -- or Ms. Glenn to remain in the

13  courtroom with their counsel for further instruction.

14       All right.  Are there any other matters to consider in

15  connection with the Defendants before the Court?  From the

16  Government?

17            MR. SMITH:  No, Your Honor.

18            THE COURT:  From any Defendant?

19            MR. DAVIS:  No, Your Honor.

20            MS. ROMERO:  No, Your Honor.

21            MR. GREEN:  No, Your Honor.

22            THE COURT:  Again, thank all of you.  The Defendants

23  are remanded to the custody as indicated, and we'll take a

24  short recess.

25            THE CLERK:  All rise.

 1      (A recess ensued from 12:20 p.m. until 12:36 p.m.)

 2          THE COURT:  All right.  The Court is back on the

 3  record in United States versus John Penneston and United States

 4  versus Karrissa Glenn in separate complaints but a joint

 5  hearing was held.  Thank you.  You may be seated.

 6      I just want to go over the order setting conditions of

 7  release as to each of those Defendants.  After a full hearing

 8  on the issue of detention, the Court determined that conditions

 9  could be set.  And so in the brief recess, an order setting

10  conditions of release was prepared.

11      Mr. Penneston, have you had sufficient time to review that

12  order?

13          DEFENDANT PENNESTON:  Yes, sir.

14          THE COURT:  Can you turn your microphone for me, Mr.

15  St. John?

16          MR. ST. JOHN:  I'm sorry, Judge.

17          THE COURT:  That's okay.

18          MR. ST. JOHN:  We had turned it to have some privacy,

19  and I apologize.

20          THE COURT:  No, yes, perfect.

21          MR. ST. JOHN:  Yes, sir.

22          THE COURT:  Thank you.  And Ms. Glenn, have you had

23  sufficient time to review that order?

24          DEFENDANT GLENN:  Yes, sir.

25          THE COURT:  Do you understand all of the conditions

1   that are set forth in your order?  Mr. Penneston?

2           DEFENDANT PENNESTON:  Yes, sir.

3           THE COURT:  Ms. Glenn?

4           DEFENDANT GLENN:  Yes, sir.

5           THE COURT:  On Page 3 of each of the orders, it

6   appears to be signed by each of you under "Acknowledgment of

7   the Defendant," letting me know that you understand all of the

8   conditions and you promise to obey them.  Is it your signature

9   that appears on your order, Mr. Penneston?

10          DEFENDANT PENNESTON:  Yes, sir.

11          THE COURT:  And on yours, Ms. Glenn?

12          DEFENDANT GLENN:  Yes, sir.

13          THE COURT:  Just above your signatures on Page 3 is a

14  set of provisions which set forth the possible penalties and

15  sanctions should you fail to comply with the order.  Did each

16  of you review those carefully?  Mr. Penneston?

17          DEFENDANT PENNESTON:  Yes, sir.

18          THE COURT:  Ms. Glenn?

19          DEFENDANT GLENN:  Yes, sir.

20          THE COURT:  Do you understand it can be a separate

21  federal offense for you to fail to comply with these

22  conditions?  Mr. Penneston?

23          DEFENDANT PENNESTON:  Yes, sir.

24          THE COURT:  Ms. Glenn?

25          DEFENDANT GLENN:  Yes, sir.

```
 1            THE COURT:  There's an additional consequence I want
 2  to inform you of, and that is your failure to comply with these
 3  conditions could adversely affect the case you presently have
 4  before our Court.  Your attorneys can explain this to you in
 5  more detail, but in short, a district judge could find that you
 6  have failed to accept responsibility for your conduct if you
 7  can't abide by conditions of release.  Do you understand
 8  generally that it could have that adverse effect, Mr.
 9  Penneston?
10            DEFENDANT PENNESTON:  Yes, sir.
11            THE COURT:  Ms. Glenn?
12            DEFENDANT GLENN:  Yes, sir.
13            THE COURT:  All right.  Are the conditions -- are
14  there any others the Government would ask the Court to consider
15  in either of these matters?
16            MR. SMITH:  No, Your Honor.
17            THE COURT:  Do either defense counsel have any issues
18  with the conditions as set?  Mr. St. John?
19            MR. ST. JOHN:  No, Judge.
20            THE COURT:  Mr. Crum?
21            MR. CRUM:  No, Your Honor.
22            THE COURT:  All right.  You're both relatively young.
23  Especially you, Ms. Glenn.
24            MR. ST. JOHN:  I thought you were talking about me,
25  Judge.
```

1          THE COURT:  Not you, Mr. St. John.  But I'm giving you

2  this chance.  And if you mess it up, don't come back and ask

3  for a second chance.  This is your second chance when I sign

4  this document.  And so I won't look favorably upon your failure

5  to abide by these simple conditions.  And some of them are

6  there to help you.  To help you get counseling, to help you get

7  services you might need.  And I tell the family now that are in

8  the courtroom, if you see that, you know, Mr. Penneston or Ms.

9  Glenn not following these conditions, you'll be doing them a

10  favor by letting my Pretrial Services know and letting me know

11  before it gets too out of hand and the consequences are more

12  severe.  So, keep that in mind.  I'm going to count on you as

13  well to help me out.

14      All right.  So I find that each of the Defendants

15  understands the conditions of release and that they are

16  appropriate in each of those cases.  I'm signing an order

17  setting conditions of release.  I order the Marshals release

18  each of these Defendants after any appropriate processing, if

19  any.

20      Are there any other matters to consider as to Mr. Penneston

21  or Ms. Glenn?  From the Government?

22          MR. SMITH:  No, Your Honor.

23          THE COURT:  From either Defendant?

24          MR. ST. JOHN:  No, Judge.

25          MR. CRUM:  No, Your Honor.

1          THE COURT:  Very well.  Then the Defendants are

2   ordered released after any appropriate processing upon these

3   conditions of release.

4        Again, thank all of you for your patience and for your time

5   and effort.

6          DEFENDANT GLENN:  Thank you.

7          THE COURT:  The attorneys are excused.

8        (Proceedings concluded at 12:40 p.m.)

9                              --oOo--

10

11

12

13

14

15

16

17

18

19

20                           CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
22   entitled matter.

23      **/s/ Kathy Rehling**                    **09/29/2017**

24   _____        _____

     Kathy Rehling, CETD-444                         Date
25   Certified Electronic Court Transcriber

```
 1                              INDEX

 2
    PROCEEDINGS                                          3
 3
    WITNESSES
 4
    Government's Witnesses
 5
    Mike McCurdy
 6  - Direct Examination by Mr. Smith                    5
 7  - Cross-Examination by Mr. Davis                    35
    - Cross-Examination by Mr. Green                    39
 8  - Cross-Examination by Ms. Romero                   45
    - Cross-Examination by Mr. O'Shea                   55
 9  - Examination by the Court                          60
    - Redirect Examination by Mr. Smith                 61
10
    EXHIBITS
11
    -none-
12
    RULINGS                                            83
13
    END OF PROCEEDINGS                                 91
14
    INDEX                                              92
15

16

17

18

19

20

21

22

23

24

25
```